# Commonwealth of Massachusetts

RECEIVED
CITY OF LOWELL
2003 MAR 12 AM 7: 27

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 03-0794-G

Rodney Desrosiers _____, Plaintiff(s)

v.

Edward F. Davis, III
Judith Sweet
Dennis R. Cormier _____, Defendant(s)

## SUMMONS

To the above-named Defendant:   Judith Sweet

You are hereby summoned and required to serve upon  Ellen L. Poster, Esq.

plaintiff's attorney, whose address is 68 Commercial Wharf, Boston, MA 02110, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the _____10th_____ day of March _____, in the year of our Lord two thousand _three_ .

3/11/2003

A TRUE COPY ATTEST

DEPUTY SHERIFF

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.

2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED

(1) TORT   (2) MOTOR VEHICLE TORT   (3) CONTRACT   (4) EQUITABLE RELIEF   (5) OTHER

FORM CIV.P. 1 3rd Rev.

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                      SUPERIOR COURT DEPARTMENT
                                 CIVIL ACTION NO.
                                 04-0794-G

Rodney Desrosiers,           )
        Plaintiff            )
                             )
v.                           )
                             )
Edward F. Davis, III         )
Judith Sweet                 )
Dennis R. Cormier,           )
        Defendants           )

        ———

COMPLAINT

1. The Plaintiff Rodney Desrosiers is an individual who resides at 32 Shurtleff Street, Apartment No. 1, Chelsea, Massachusetts 02150 (hereinafter "the Plaintiff").

2. The Defendant Edward F. Davis, III is an individual who resides at 169 Sanders Avenue, Lowell, Massachusetts 01851 (hereinafter "Defendant Davis").

4. The Defendant Judith Sweet is an individual who resides at 4 Suites Pond Way, Dunstable, Massachusetts 02107 (hereinafter "Defendant Sweet").

5. The Defendant Dennis R. Cormier is an individual who resides at 67 Delaware Avenue, Lowell, Massachusetts (hereinafter "Defendant Cormier").

FACTUAL BACKGROUND

6. Paragraphs 1- 5 are incorporated herein by reference.

7. The Plaintiff is a police officer employed by the City of Lowell since on or about June 1987 continuously to the present time.

8. Defendant Davis is the Chief of Police of the City of Lowell since 1995.

9. Defendant Sweet is an employee of the City of Lowell, whose responsibilities include handling all injury claims for all City employees since 1966 to the present.

10. Defendant Cormier is the Deputy Superintendent of the City of Lowell Police Department since 1999.

11. On February 21, 2000, the Plaintiff's attorney, Denise McWilliams, met with Defendant Davis to seek workman's compensation benefits (hereinafter "111F benefits") on behalf of the Plaintiff.

12. In the course of that meeting, Attorney McWilliams informed Defendant Davis that the Plaintiff was HIV positive (hereinafter "medical condition") as the result of a work-related incident.

13. No employee of the City of Lowell knew the Plaintiff's medical condition prior to Attorney McWilliams' informing Defendant Davis of the Plaintiff's medical condition in the course of her meeting with him on February 21, 2000.

14. The Plaintiff's medical condition was a fact of a highly personal and intimate nature.

15. Attorney McWilliams requested Defendant Davis to keep the Plaintiff's medical condition confidential. She stressed to Defendant Davis the sensitive nature of this medical information and requested him to keep it confidential. She informed Defendant Davis that the Plaintiff had deep concerns about the confidentiality of his diagnosis in terms of his ability to work in the Lowell Police Department if his fellow officers became aware of his medical condition.

16. The Plaintiff had not revealed his medical condition to any employee of the City of Lowell prior to Attorney McWilliams' meeting with Defendant Davis because of the stigma associated with this medical condition in the community at large and within the Lowell Police Department in particular.

17. Attorney McWilliams provided Defendant Davis with a copy of the Plaintiff's 1989 incident report, arrest report and supervisor's report,

concerning a needle stick experienced by the Plaintiff while on duty. None of those documents set forth the Plaintiff's medical condition.

18. Defendant Davis provided assurances to Attorney McWilliams that the Plaintiff's medical condition would be kept confidential.

19. Defendant Davis wrote a memorandum to one of the City of Lowell's attorneys, Attorney Christine O'Connor, on February 23, 2000, informing her of the Plaintiff's medical condition. (See Exhibit A attached hereto.)

20. Defendant Davis provided Attorney O'Connor with the memorandum and the documents provided to him by Attorney McWilliams.

21. Upon receipt of the memorandum and documents provided to her by Defendant Davis, Attorney O'Connor gave the memorandum and documents to Defendant Sweet.

22. According to Defendant Davis, in his deposition of September 13, 2001, the only persons who needed to know the Plaintiff's medical condition were the City Solicitor's office, Defendant Davis, Defendant Sweet and the City Manager. (See page 11 of Defendant Davis' deposition attached hereto as Exhibit B.)

23. Defendant Sweet told at least Police Officer David Abbott of the Plaintiff's medical condition.

24. Defendant Davis told at least Defendant Cormier of the Plaintiff's medical condition.

25. Defendant Cormier told at least Police Officer William Busby of the Plaintiff's medical condition.

26. Within one week of Attorney McWilliams' meeting with Defendant Davis, the Plaintiff's medical condition became well known throughout the City of Lowell Police Department.

27. Knowledge of the Plaintiff's medical condition became known to citizens of the City of Lowell.

28. The actions of Defendant Davis constituted an unreasonable, substantial and/or serious interference with the Plaintiff's right to privacy.

29. The actions of Defendant Sweet constituted an unreasonable, substantial and/or serious interference with the Plaintiff's right to privacy.

30. The actions of Defendant Cormier constituted an unreasonable, substantial and/or serious interference with the Plaintiff's right to privacy.

31. The actions of Defendants Davis, Sweet and Cormier caused the Plaintiff monetary damages and emotional distress.

COUNT I
VIOLATION OF M.G.L. c. 214 SECTION 1B
(Rodney Desrosiers v. Edward F. Davis, III)

32. Paragraphs 1-31 are incorporated herein by reference. Defendant Davis violated M.G.L. c. 214 Section 1B in his conduct concerning the Plaintiff

33. The Plaintiff suffered economic losses, including but not limited to lost wages and lost payment of health insurance benefits and emotional distress as a result of the unreasonable, substantial and/or serious interference with his privacy by Defendant Davis.

WHEREFORE, the Plaintiff demands a judgment in his favor in an amount to be determined by the trier of fact, together with interest and costs, and such other relief as the Court deems just and appropriate.

COUNT II
VIOLATION OF M.G.L. c. 214 SECTION 1B
(Rodney Desrosiers v. Judith Sweet)

34. Paragraphs 1-33 are incorporated herein by reference. Defendant Sweet violated M.G.L. c. 214 Section 1B in her conduct concerning the Plaintiff

35. The Plaintiff suffered economic losses, including but not limited to lost wages and lost payment of health insurance benefits and emotional distress as a result of the unreasonable, substantial and/or serious interference with his privacy by Defendant Sweet.

WHEREFORE, the Plaintiff demands a judgment in his favor in an amount to be determined by the trier of fact, together with interest and costs, and such other relief as the Court deems just and appropriate.

## COUNT III
### VIOLATION OF M.G.L. c. 214 SECTION 1B
### (Rodney Desrosiers v. Dennis R. Cormier)

36. Paragraphs 1- 35 are incorporated herein by reference. *Defendant Cormier Violated M.G.L. c.214 Section 1B in his conduct concerning the*

37. The Plaintiff suffered economic losses, including but not limited to lost *of Plaintiff* wages and lost payment of health insurance benefits and emotional distress as a result of the unreasonable, substantial and/or serious interference with his privacy. *by Defendant Cormier.*

WHEREFORE, the Plaintiff demands a judgment in his favor in an amount to be determined by the trier of fact, together with interest and costs, and such other relief as the Court deems just and appropriate.

The Plaintiff requests a jury trial on all issues as to which he has a right to a trial by jury.

Plaintiff Rodney Desrosiers
By his attorney

Ellen L. Poster
68 Commercial Wharf
Boston, MA 02110
(617)742-6767
BBO No. 404080

# Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 01-0843 F

John Doe
_____ , Plaintiff(s)

v.

John F Cox
_____ , Defendant(s)

## SUMMONS

To the above-named Defendant:

You are hereby summoned and required to serve upon _Denis McWilliams_

plaintiff's attorney, whose address is _9 9 MAGAZIN ST Cambridge 02139_ an answer to
the complaint which is herewith served upon you, within 20 days after service of this summons upon you,
exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the
relief demanded in the complaint. You are also required to file your answer to the complaint in the office
of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable
time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which
you may have against the plaintiff which arises out of the transaction or occurrence that is the subject
matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, Suzanne V. DelVecchio, Esquire, at Boston, the _22nd_ _____ day of
_February_ _____, in the year of our Lord two thousand _and one_ _____.

*Michael Joseph Donovan*

Clerk/Magistrate

A TRUE COPY ATTEST

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant,
   each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT – (3) CONTRACT – (4) EQUITABLE RELIEF  (5) OTHER

FORM CIV.P. 1 3rd Rev. 30M 10/2000

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT

SUFFOLK, ss:

Superior Court Department
Civil Action No. 01·0P43F

```
_____
                      )
JOHN DOE,             )
         Plaintiff    )
                      )
v.                    )
                      )
CITY OF LOWELL,       )
JOHN F. COX, and      )
EDWARD DAVIS          )
         Defendants   )
_____)
```

COMPLAINT

1. Plaintiff, a duly appointed police officer of the City of Lowell, brings this action to obtain the benefits to which he is entitled by M.G.L. ch. 41, §111F.

2. John Doe is a resident of Chelsea, Suffolk County, Massachusetts.

3. The defendant, City of Lowell, is a municipality organized under the laws of the Commonwealth and is located in Middlesex County, Massachusetts.

4. The defendant, John F. Cox, is the appointing authority in his capacity as City Manager of the City of Lowell.

5. The defendant, Edward Davis, is the superior of the plaintiff in that he is the Superintendent of the Police Department of the City of Lowell.

6. Since plaintiff's appointment as a police officer in 1986, he has been well regarded and received numerous commendations, citations and awards during the course of his employment

7. At the time of the events described in this Complaint, the Lowell Housing Authority paid the Lowell Police Department to provide police details for the

Lowell Housing Authority. The Lowell Police Department considered such assignments an extra detail.

8. On or about November 4, 1989, plaintiff, in his capacity as a Lowell police officer along with another Lowell police officer, was assigned to the Lowell Housing Authority by the Detail Office of the Lowell Police Department.

9. Plaintiff was assigned, from 9:00 AM to 5:00 PM to patrol the Lowell Housing Authority's properties and surrounding areas.

10. While in the course of patrolling his assigned area, plaintiff and the other officer observed 2 individuals engaged in an apparent drug transaction.

11. The suspects fled in different directions as plaintiff and the other officer approached. Plaintiff pursued one of the suspects and apprehended him.

12. In the course of searching the suspect, plaintiff was stuck by a hypodermic syringe/needle hidden in the suspect's pocket. As of the date of the incident, defendants had in place a policy that required that an officer who suffered a possible unprotected exposure to an infectious disease to report the incident to the Police Department. (See attached Order #88-01, marked "A")

13. Pursuant to said policy, plaintiff filed a notice of the incident with the Police Department on November 4, 1989. (See attached incident report, marked "B")

14. On November 4, 1989 plaintiff went to St. Joseph's Hospital in Lowell where he received a vaccination for tetanus and an initial vaccination for Hepatitis B.

15. On or about November 15, 1989, plaintiff received a letter from the Workmen's Comp Agent for the City of Lowell in which he was requested to arrange for an examination by the City Physician. The letter further stated that failure to do so would be "[s]ufficient reason for the City of Lowell to deny any liability…"

2

16. Plaintiff arranged the examination with the City Physician on November 30, 1989 who advised him only to complete the vaccination series for hepatitis B. (See attached letter marked "C").

17. Neither the Police Department nor the City Physician evaluated plaintiff clinically or serologically for exposure to HIV at the time of this incident as required by Police Department policy. Nor were any steps taken to determine if the hypodermic syringe/needle was contaminated with any infectious agents. (See Attachment A, paragraph C. 3)

18. As a result of the injury he incurred in this incident, plaintiff contracted HIV; plaintiff tested positive for the presence of HIV in 1991.

19. Plaintiff continued to work from August 1991 to February 2000 when plaintiff's continually, deteriorating health made it impossible for him to perform the duties of a police officer. (See attached letter marked "D").

20. On or about February 21, 2000, plaintiff applied for leave with pay for incapacitated employees pursuant to M.G.L. ch. 41, §111F.

21. Plaintiff's claim for leave with pay was referred by defendants to the City Solicitor, who on May 10, 2000 refused payment, on the basis of a medical opinion that the plaintiff's injuries were not related to an injury sustained in the performance of his duty without fault of his own. (See attached medical opinion of Dr. Jeffrey K. Griffiths and letter from City of Lowell, dated May 10, 2000 marked "E")

22. Plaintiff, with the agreement of the City Solicitor, subsequently submitted a medical opinion that plaintiff's injury was consistent with the injury he sustained on November 4, 1989, and that defendants' denial of plaintiff's claim was based on conjecture because of defendants' failure to adhere to the standard of care governing occupational exposures to infectious diseases, as well as its own

3

policies.. (See attached medical opinion of Dr. Jonathan S. Appelbaum, marked "F".)

23. Defendants disregarded plaintiff's medical opinion and again denied plaintiff's claim on December 7, 2000. (See attached letters marked "G").

24. Since February, 2000, plaintiff has been paid his full salary under his sick leave benefits and under sick leave benefits donated by other officers.

25. At the time of this incident, plaintiff was not retired or pensioned, but was a duly appointed police officer for the City of Lowell in its police department.

26. At the time of this incident on November 4, 1989, there was in effect a rule of law to the effect that if a policeman was injured while "in the performance of his duty," he was entitled to his full pay during the period of disability.

27. The provisions of M.G.L. ch. 41, §111F, as amended, apply to the City of Lowell.

28. An actual and serious controversy has arisen between the plaintiff and the various defendants as to whether or not the plaintiff is entitled to his full pay under the provisions of M.G.L. ch. 41, 111§F. and whether plaintiff should be required to use his accumulated and donated sick leave benefits to be paid during this period of disability.

29. Plaintiff believes and therefore avers that he and the named defendants are all of the parties having or claiming any interest which might be affected by any declaratory ruling of the Court under these proceedings.

WHEREFORE, plaintiff demands:

    1. That a declaratory judgment be issued as to the rights of the various parties resolving the controversy as set forth in paragraph 28 of this Complaint.

    2. That declaratory relief be granted and determined as to whether plaintiff is eligible for his pay under the provisions of M.G.L. ch. 41, §111F.

3. That defendants, their agents, servants or employees, be ordered and directed to correct plaintiff's personnel records to show that his accumulated and donated sick leave benefits have been, and continue to be erroneously used.

4. That defendants, their agents, servants or employees be ordered and directed to correct their records to show that the payment made to plaintiff for his disability was, and continues to be paid under the statutory provisions of M.G.L. ch. 41, §111F.

5. And for such further relief as this Court may deem just and equitable.

Respectfully submitted,
JOHN DOE
By his attorney,

DATE: February 22, 2001

Denise McWilliams
99 Magazine Street
Cambridge, MA   02139
617.876.6100
BBO#340600



RECEIVED
LAW DEPT.
CITY OF LOWELL

# NOTIFY

**2004 NOV 22  AM 8:53** COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

**SUPERIOR COURT DEPARTMENT**
Civil Action No.  2001-00843-F

*notice*
*sent*
*11/18/04*
*D. McW.*

*T. E.S.*
*K. a mc m.*
*C of Lowell*
*Law Dept.*

*( mb )*

JOHN DOE,
**Plaintiff**

vs.

**CITY OF LOWELL & others[1],**
**Defendants**

## FINDINGS OF FACT, RULINGS OF LAW AND JUDGMENT OF THE COURT

### INTRODUCTION

The plaintiff, John Doe ("Doe"), brought this action against the defendants, City of

Lowell ("City"), John F. Cox ("Cox"), and Edward Davis ("Davis"), alleging the wrongful denial

of G. L. c. 41 § 111F disability benefits for an injury sustained in the course of his duty as a

police officer. The Complaint alleges that Doe contracted the Human Immunodeficiency Virus

(HIV) in 1989 when he pricked his finger with an infected needle while searching a suspect in

the course of his duties as a police officer.  The City denied Doe's claim for benefits.  Doe's

claims were tried to this court sitting without a jury on April 12, 2004.  After considering the

testimony of the witnesses and reviewing the exhibits, I make the following findings of fact,

rulings of law and order for judgment.

---

[1]    John F. Cox is the City Manager of Lowell. Edward Davis is the Superintendent of the Lowell
Police Department. Judgment under G. L. c. 41, §111F, the statute under which this action is brought, does not run
against the individual officers of the city. The Complaint, therefore, shall be dismissed as to these defendants. See
Gardner v. Peabody, 23 Mass. App. Ct. 168, rev. denied 398 Mass. 1107 (1986).

## FINDINGS OF FACT

Doe is a homosexual male who has been employed as a police officer for the City of Lowell Police Department ("Department") since August 27, 1987. By all accounts, Doe was an outstanding police officer during his time with the Department. He received three citations, two commendations, numerous letters of praise and a designation as Officer of the Year in 1995. All of this changed on November 4, 1989 after the Department assigned Doe and another officer, Daniel Lamarche ("Lamarche"), to patrol the Adams Street area in Lowell.

While on patrol at approximately 4:00 p.m., Doe and Lamarche observed what they believed to be a drug transaction. When they stopped their patrol vehicle to investigate, the suspects attempted to evade them. Doe managed to apprehend one of the suspects. He then commenced a pat-down for weapons and a search for narcotics. While conducting the search, Doe stuck his bare right index finger on a hypodermic needle that was hidden in a pocket on the sleeve of the suspect's jacket. Doe noticed that the needle stick had drawn blood. The suspect was arrested for the possession of a hypodermic needle.

After the needle stick, Doe followed the Policy and Procedures Regarding Possible Exposure of Department Personnel to Infectious Disease ("Policy") adopted by the Department in January 1988. The Policy applies to:

> any care provider (e.g. EMT, fire fighter, police officer, or corrections officer) who believes he or she may have had an unprotected exposure to an infectious disease in the course of attending, assisting, or transporting a person to a hospital or clinic as part of his/her professional duties.

Though the Policy requires that all officers carry protective disposable gloves while on duty, it does not explicitly require officers to use gloves during the search of a subject.[2] The precautions outlined in the Policy are mandated only when police officers are "involved in an incident which may result in possible exposure to infectious disease." The Policy makes no attempt to further define when precautionary measures are required. A police officer who suffers a puncture wound in the line of duty also is obligated to notify his supervisor immediately and complete an incident report detailing the incident. The Policy further requires that the exposed officer be clinically evaluated for evidence of infection through the City of Lowell Physician's Office. No provision is made under the Policy for testing of a needle or any other object that has exposed a police officer to the risk of infection. Lastly, the Policy does not impose the burden of testing on the employee.

Immediately after the incident, Doe went to the emergency department of St. Joseph's Hospital to seek care for his possible exposure to an infectious disease. The treating physicians at St. Joseph's Hospital administered a tetanus shot and the first of three vaccinations against Hepatitis B, a blood born pathogen. The physicians at St. Joseph's Hospital did not test Doe for HIV, the virus that causes Acquired Immune Deficiency Syndrome (AIDS). Doe was instructed to soak his right index finger and to schedule a follow-up appointment with Dr. John Janas, the City Physician. On November 30, 1989, Doe reported as required for the follow-up appointment with Dr. Janas who also did not recommend HIV testing to Doe. Dr. Janas determined that

---

[2] Even if Doe had worn latex gloves, it is unlikely that this precaution would have prevented the needle stick.

Doe's physical examination was "within normal limits" and that "at this time [there is] no sequelae."

Doe also took immediate steps to notify his supervisor of the incident. He filed a report, as required by the Department's Policy, outlining the details of the incident.[3] At no time did the Department challenge the accuracy and completeness of the report, investigate the report or demand additional information from Doe.

The Department never tested the needle for the presence of HIV. Nor is testing required under the Policy. The Policy provides only that items contaminated with blood or other body fluids be secured, tagged and preserved. At some point in 2001, however, the City's counsel placed the needle in a safe at Lowell City Hall.

In August 1991, Doe tested positive for HIV.[4] HIV is a sexually transmitted disease that can be transmitted through contact with the bodily fluids, semen, vaginal secretions, blood, and the breast-milk of an infected individual. HIV can be transmitted via a needle stick, though the risk of transmission is quite low.[5] At the time of his HIV diagnosis, Doe had a CD4 cell count of 270. The CD4 cells are a surrogate marker for the functioning of the immune system. Additionally, CD4 counts are used routinely in the field of medicine to estimate stages of the

---

[3]     Defendant complains that Doe failed to complete a "standardized form at the health care facility in accordance with G. L. c. 111 and 111C" in violation of the Department's Policy. It does not appear, however, that Doe can be faulted for failing to complete the form. There is no evidence that this form, which presumably is in the custody or control of the hospital or medical facility, was ever given to Doe. In any event, the failure to complete the form does not bear on the issues before me.

[4]     Doe was motivated to get tested because of a relationship involving unprotected sex with another man. He was also responding to the vigorous advocacy of HIV testing.

[5]     The undisputed evidence is that the risk of transmission is 0.1%.

disease progression for chronic conditions like HIV. The normal CD4 count for an individual ranges from 500 to 1500.

By early 2000, Doe's health had deteriorated to the point that he was unable to perform his duties as a police officer. Doe informed the Department of his HIV status for the first time in February 2000, when he applied for leave with pay pursuant to G. L. c. 41 § 111F. In April 2000, Doe provided the City with a statement from his physician, Dr. Howard Libman, stating that Doe was unable to perform the tasks required of a police officer due to his deteriorating health. Dr. Libman did not opine on the cause of Doe's incapacitation. Doe has not reported for duty since January 2000.

Doe's baseline HIV status at the time of the needle stick is unknown because the physicians who treated Doe never recommended or administered an HIV test to Doe. In addition, the needle and the suspect who carried it, were never tested in order to ascertain whether either was infected with HIV. In 1991 when Doe informed the Department that he had contracted HIV from the needle stick, testing would have been futile. The available scientific evidence suggests that it would not have been possible for the HIV virus to survive the two years that elapsed between the needle stick and Doe's HIV diagnosis.

Beginning in or about 1987, Doe began a long term monogamous relationship with another man. After three months, Doe and the man engaged in unprotected sexual activity which continued until their relationship ended in 1990. This man tested negative for HIV on May 20, 2003. Prior to this relationship, Doe engaged in oral sex with other men. Doe, however, used a condom each time he engaged in oral sex with these individuals. Doe has never been an intravenous drug user and has never had a blood transfusion.

5

The City denied Doe's claim for leave with pay on May 10, 2000, pursuant to the recommendation of its medical expert, Dr. Jeffrey Griffith[6], who concluded that Doe's HIV status was not the result of "an injury sustained in the performance of his duty without fault of his own." Specifically, Dr. Griffith opined that Doe likely contracted HIV seven years prior to his 1991 diagnosis, and therefore approximately five years prior to his 1989 needle stick injury. Dr. Griffith's analysis was informed by several medical publications that, in his view, support the hypothesis that HIV infected persons generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Using Doe's CD4 count of 270 at the time of diagnosis, Dr. Griffith assumed that Doe had an average CD4 count of 1000 prior to his infection and that Doe lost sixty CD4 cells per year after he became infected. According to Dr. Griffith's analysis, Doe's CD4 count of 270 corresponded with an infection seven years earlier. Dr. Griffith also supported his opinion by reference to Beth Israel Deaconess Hospital medical records suggesting that Doe was diagnosed in the early 1990s with thrush, an AIDS related condition that usually presents in patients after five to seven years of diagnosis with HIV. However, Doe's medical records do not indicate either diagnosis or treatment for thrush. Indeed, Dr. Libman, Doe's physician, certified that Doe was never diagnosed with or treated for thrush at the Beth Israel Deaconess Hospital. No record from any other physician or hospital establishes that Doe ever was diagnosed with thrush.

After his claim was denied in May 2000, Doe submitted supplemental medical information to the City and requested reconsideration of his claim for leave with pay. By letter

---

[6]      Dr. Griffith's expert qualifications include that he is Board Certified in Internal Medicine, Pediatrics, and Infectious Diseases.

dated December 7, 2000, the City again denied Doe's claim, maintaining its position that Doe's

HIV and resulting disability were unrelated to any injury arising out of and in the course of his

employment as a Lowell police officer.[7]

## CONCLUSIONS OF LAW

Doe's claim for G. L. c. 41, §111F benefits rests on his assertion that 1) during the course

of his employment as a Lowell police officer, he was stuck by a needle infected with HIV; that he

contracted the HIV from the needle stick; and that, as a result, he is incapacitated. The statute

provides in relevant part as follows:

> "Whenever a police officer or fire fighter of a city, town, or fire or water district is
> incapacitated for duty because of injury sustained in the performance of his duty without
> fault of his own, or a police officer or fire fighter assigned to special duty by his superior
> officer, whether or not he is paid for such special duty by the city or town, is so
> incapacitated because of injuries so sustained, he shall be granted leave without loss of
> pay for the period of such incapacity."

Doe, as the party making the claim under G. L. c. 41, § 111F,  bears the burden of proving that he

satisfies all the requirements of the statute. See Adams v. Contributory Retirement Appeal Bd.,

414 Mass. 360, 365 (1993)(plaintiff in analogous proceeding under G. L. c. 32, § 7(1) bears the

burden of proving that he comes within all the terms of the statute).

In order to prevail on this claim, therefore, Doe must establish that: (1) he sustained an

injury; (2) the injury was sustained without fault of his own; (3) the injury was sustained in the

performance of his duty; and (4) he is incapacitated for duty because of that injury. Doe

established that he suffered the needle stick while searching a suspect in the course of his duty as

---

[7]    Dr. Elias Nabbout, the current City Physician, concluded on November 12, 2003 that Doe is
medically unable to return to work. This opinion, however, sheds no light on the contested issue whether Doe's
disability was caused by the needle stick.

an officer.  See <u>Yates</u> v. <u>City of Salem</u>, 342 Mass. 460, 461-462 (1961) (an officer injured while in uniform, performing the work of a police officer, has suffered an injury in the performance of his duty); See also <u>Wormstead</u> v. <u>Town Manager of Saugus</u>, 366 Mass. 653, 659 (1975).  The needle stick that Doe sustained to his right index finger qualifies as an injury within the purview of the statute.  <u>Blair v. Board of Selectmen of Brookline</u>, 24 Mass. App. Ct. 261, 264 (1987) (an injury for purposes of G. L. c 41, §111F need not be traumatic in origin).  Additionally, the defendant does not challenge that Doe's needle stick occurred through no fault of his own. See <u>DiGloria</u> v. <u>Chief of Police</u>, 8 Mass. App. Ct. 506, 512-15 (1979)(the test for determining if the injury occurred "without fault of his own" is whether the injury occurred as a result of "serious and wilful misconduct" on the part of the police officer).  Indeed, there is no evidence remotely suggestive of misconduct by Doe in causing the needle stick.  The only issue, therefore, is whether Doe established that he contracted HIV from the needle stick in 1989, and that his resulting incapacitation due to the progression of HIV stems from that needle stick injury.

Doe argues, and I agree,  that the evidence is sufficient to support his claim that the November 4, 1989 needle stick is the likely source of his HIV infection. Though Doe is an acknowledged homosexual, the credible evidence before me establishes that Doe's sexual conduct, both before and after the needle stick, did not expose him to a substantial risk of contracting HIV.  Doe engaged in oral sex with several partners in the years before the needle stick but he used a condom during those encounters.  Doe's relationship with his long-time partner, a man with whom he had unprotected sex, began in 1987 and ended in 1990.  This individual, however, tested negative for the HIV in 2003.  Doe had no other sex partners after

<u>8</u>

1990. In these circumstances, I conclude that the needle stick on November 4, 1989 is the likely source of Doe's HIV.

Second, I credit the opinion of Dr. Jonathan Appelbaum[8], Doe's expert, that Doe's CD4 count of 270 at the time of his HIV diagnosis in 1991 was compatible with having contracted HIV in November of 1989. Dr. Appelbaum based his opinion on extensive professional experience dealing with HIV positive patients and on his review of Doe's medical records. Nothing in Doe's medical records confirmed symptoms or conditions that might be associated with HIV having been contracted seven years prior to 1989. Also, in Dr. Appelbaum's view based on his hands-on experience with hundreds of HIV patients, Doe's CD4 count was not "unusually low" for a person who had been infected for only two years. Finally, I am persuaded by Dr. Appelbaum's explanation of the risk of infection from the particular type of needle Doe encountered on November 4, 1989. Though the risk of infection from a needle is relatively low, the risk associated with the hollow-bore needle that caused the injury to Doe is higher than with ordinary needles. A hollow-bore needle is typically used by intravenous drug users, a population at high risk for HIV. Such a needle is more likely to contain blood in the cavity of the needle and, therefore, more likely to transmit HIV if the user is infected with HIV.

The City counters Doe's claim with Dr. Griffith's opinion that Doe was infected at least seven years prior to that date. Before reaching any conclusion on the legal significance of the expert opinion offered by the defendant, I review briefly the basic principles governing the admission of the scientific evidence.

---

[8]    Dr. Appelbaum is board certified in internal medicine. He is the Medical Director of the Fenway Community Health Center which specializes in the treatment of HIV and AIDS patients. Dr. Appelbaum treats approximately 185 HIV/AIDS patients in his practice.

Under Commonwealth v. Lanigan, 419 Mass. 15 (1994), a party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community, or by showing that the evidence is reliable and valid through an alternate means. Commonwealth v. Sands, 424 Mass. 184, 185-186 (1997). The trial court's acceptance of the evidentiary usefulness of a theory or method will not solely depend on general acceptance and validation over time. Lanigan, 419 Mass. at 25 (noting that peer review and publication of the theory or process are pertinent, but not an indispensable predecessor of admissibility). In order for the court to accept an expert's scientific opinion, the proponent must establish that the expert has "a reliable basis in the knowledge and experience of his discipline." Id. at 25 citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592. A trial judge assessing the credibility of an expert witness must determine whether the scientific testimony that witness proposes engenders the requisite degree of reliability and validity to meet the flexible Daubert standard. To do this, four factors may be considered: (1) whether the theory has been subjected to peer review and publication; (2) whether the theory has been tested; (3) whether the theory has a known error rate; and (4) whether the theory has general acceptance in the scientific community. Lanigan, 419 Mass. at 25 citing Daubert, 509 U.S. at 593-94. The trial judge, in essence, assumes a "gatekeeper role" in deciding whether the reasoning or methodology of the expert can properly be applied to the facts in issue. Lanigan, 419 Mass. at 26. These considerations guide my analysis of the expert testimony on whether Doe's HIV infection resulted from the November 4, 1989 needle stick.

Since neither Doe nor the arrestee were tested at the time of the incident, the City offered expert testimony from Dr. Griffith purporting to retroactively determine the approximate date of

his HIV infection. Dr. Griffith's hypothesis is that individuals generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Additionally, individuals not infected with HIV have, on average, a T-cell or CD4 count between 500 and 1500. Dr. Griffith, therefore, assumed that Doe's average CD4 count prior to HIV infection was 1000, and that upon infection Doe's CD4 count began declining at a rate of sixty T-cells per year from this base level. Operating from this premise, Dr. Griffith then retroactively calculated that, if Doe had a CD4 count of 270 in 1991, and had lost CD4 cells at a linear rate of sixty per year from a base of 1000, then he would have contracted HIV seven years prior to 1991, and five years prior to the 1989 needle stick injury. Dr. Griffith asserts that the methodology he used to retroactively calculate the date of Doe's HIV infection is recognized in several medical journals subject to peer review and accepted in the general medical community. Based on this court's independent review of the literature, however, I conclude that Dr. Griffith's opinion does not meet the Daubert/Lanigan test.

While publication and peer review establish an indicia of reliability and acceptance within the scientific community under Daubert, this court must examine the reliability and validity of the articles based on their content as well. Daubert, 509 U.S. at 592. None of the articles relied on by Dr. Griffith establish that his methodology, retroactively calculating the date of HIV seroconversion[9] based on CD4 count at diagnosis, is universally accepted or reliable in the medical community.

A study conducted by the Cascade Collaboration, *Differences in CD4 Cell Counts at Seroconversion and Decline Among 5739 HIV Infected Individuals with Well Estimated Dates of*

---

[9]    Seroconversion is the process whereby detectable antibodies become present in the blood directed against an infectious agent. Following seroconversion, a person who is infected with HIV would test positive for the disease based on the presence of such antibodies in his blood.

*Seroconversion,* J. ACQUIRED IMMUNE DEFICIENCY SYNDROME, 34:76-83 (2003) ("*Cascade Study*"), focused on assessing the effect of age, sex, exposure group, calendar year at seroconversion, and HIV test interval on the rates of CD4 cell decline during the course of HIV infection to clinical AIDS. The *Cascade Study* highlights the difficulty with calculating a universal rate of CD4 decline in HIV infected patients, noting that the biologic reason behind the differences in "immunologic response [to HIV] by exposure category observed in this study remains unclear." *Cascade Study* at 81. The *Cascade Study* also noted that the "difference in absolute number of CD4 cells diminishes over time," and in no way reported a finding that CD4 cells decline in a linear manner, at a rate of sixty cells per year. Id.

The only studies reporting a numerical rate of CD4 cell decline within the sample do not adequately support Dr. Griffith's methodology of retroactively calculating the date of infection where the date of seroconversion is unknown. Though one such study reported that a CD4 count declines at a rate of seventy cells per year for HIV positive patients, it did so by specifically focusing on patients in the third through sixth year of disease progression, with **known** dates of seroconversion, who may have exhibited different AIDS related conditions. Phillip C. Hopewell, *Human ImmunoDeficiency Virus- Associated Lung Infection: An Overview*; SEMINARS IN RESPIRATORY INFECTION 4: 73-74 (1989) ("*Hopewell Study*"). The only conclusion reached by the Hopewell Study was that the concept of AIDS related conditions "must be broadened to include more than the typical AIDS defining diseases." Id. at 74.

The *Hopewell Study* did not use original research, but relied on the original data as reported in Ar Moss, et al., *Seropositivity for HIV and the Development of AIDS or AIDS related conditions: Three Year Follow Up of the San Francisco General Hospital Cohort*, BRITISH

MEDICAL JOURNAL 296: 745-750 (1988) ("*Moss Study*"). The *Moss Study* sampled 462 homosexual men in the early 1980s with a focus on determining the likelihood that HIV positive persons will develop AIDS after documented baseline testing. Among the findings, the *Moss Study* reported that "the baseline adjusted median T4 lymphocyte count" for the sample was set at a rate of approximately eighty-five cells per year. Id. at 749. The *Moss Study*, however, did not discuss whether the eighty-five CD4 count decline linear model accounted for inter-individual variation, or whether the rate of decline was uniform throughout disease progression, changed based on the stage of disease or presence of AIDS related conditions, or varied with the concomitant increase of virus burden. The *Moss Study* also reported that a multivariate analysis of progression to AIDS revealed independent predictive effects associated with significant factors outside of T-cell count such as "(i) microglobulin concentration, (ii) packed cell volume, (iii) HIV p24 antigenaemia." Id.

A study conducted in 1996, also relied on by Dr. Griffith, directly contradicts the notion that a linear model of CD4 cell decline is scientifically accurate and significant. A.C. Lepri, et al., *Is there A General Tendency for CD4 Lymphocyte Decline to Speed Up During Human Immuno Efficiency Virus Infection? Evidence From the Italian Seroconversion Study*, JOURNAL OF INFECTIOUS DISEASES 174: 775-780 (1997) ("*Lepri Study*"). The focus of the *Lepri Study* was whether CD4 cell count decline increases or decreases as lower CD4 cell counts are reached by HIV positive patients. The reported findings of the *Lepri Study* were that, while CD4 counts suggest an increasing rate of decline of on average 100 T-cells, "there is much inter-individual variability" in the pattern of decline. Id. at 775, 776. The *Lepri Study* reported that:

"we cannot rule out the possibility that some persons maintain high CD4 cell levels for long periods and that others may experience rapid cell decline at very late stages of the disease. The significance of the random quadratic coefficient confirms that individual patterns vary." Id. at 779.

A critical finding of the *Lepri Study* is that the model for CD4 decline, that was allowed to vary between individuals, is highly significant by the generally accepted standards of the scientific community. Id. at 777. The *Lepri Study*, therefore, acknowledges the significance of inter-individual CD4 count decline in HIV, and highlights the weaknesses, and diminished scientific significance, of the purely linear model of decline that Dr. Griffith assumes.

Additionally, the very studies relied on by Dr. Griffith also detract from the reliability of his methodology by pointing out the host of factors that significantly affect HIV disease progression, and the rate of CD4 count decline of infected individuals. In P.J. Veugelers, et al., *Differences in Time from HIV Seroconversion to CD4 Lymphocyte End-points and AIDS in Cohorts of Homosexual Men.* AIDS 7: 1325-1329 (1993) ("*Veugelers Study*"), scientists concluded that observed differences in CD4 decline are the result of differences in the laboratory site where the disease is measured and the techniques used. Id. at 1328. See also *Cascade Study* at 80-81(finding that sex, exposure group, and temporal changes in HIV affect rates of disease progression); *Hopewell Study* at 73-74 (presence of AIDS related conditions like Karposis Sarcoma or Tuberculosis affects disease progression); *Lepri Study* at 777 (inter-individual variability model of CD4 decline suggests that different individuals exhibit different patterns of cell decline based on the stage of their disease and their characteristics); Dr A Alaues, et al., *Similar Rate of Disease Progression Among Individuals Infected with HIV 1 Genetic Subtypes A-*

*14*

_D_, AIDS 13: 901-907 (1999)(suggesting that the virulence of the infecting strain and environmental factors affect the rate of HIV progression).

The studies relied on by Dr. Griffith, therefore, do not support the use of a linear model of CD4 count decline as a scientifically accepted method of retroactively determining a patient's date of HIV infection. I, therefore, find that Dr. Griffith's opinion was not developed "in a scientifically sound and methodologically reliable fashion," and fails to meet the reliability and validity standards articulated in Daubert and Lanigan. See Daubert, 509 U.S. at 590; Lanigan, 419 Mass. at 15.

The defendant suggests that Doe has not met his burden because Dr. Applebaum expressed his causation opinion by stating that Doe's HIV infection is "compatible with" Doe's needle stick in 1989. According to the defendant, this terminology is insufficient to prove that Doe meets the "more probable than not" standard of proof required here. Adopting the defendant's position would impose a standard of scientific certainty on Dr. Applebaum's testimony beyond that required by Daubert. Id at 590. Furthermore, Doe has met his burden by excluding all other possible sources of HIV infection via testimony regarding his sexual and medical history. See McAuliffe v. Metcalfe, 289 Mass. 67, 69 (1935) (reasoning that there is no rule of law that a causal connection must be shown by expert testimony alone); Shrewsbury Ret. Bd. v. Contributory Ret. Appeal, 5 Mass. App. Ct. 379, 381 (1977) (suggesting that, while "evidence that A is consistent with B, does not by itself warrant a finding that A caused B," it may assist the finder of fact in reaching that result). Doe has established causation by way of his medical records and his testimony concerning his sexual conduct. The defendant did not rebut

this testimony with any specific evidence tending to show that Doe was exposed to HIV by some other source.

I find that Doe is incapacitated because he is unable to perform his duties as an officer due to his deteriorating health stemming from HIV-related complications. Furthermore, on November 12, 2003, Dr. Nabbout, the City physician, found that Doe was medically unable to return to work. Doe, thus, has established that he comes within the purview of G. L. c. 41 § 111F, and that he is entitled to leave with pay.

### ORDER

For the reasons states above, I enter the following order for judgment. Judgment shall enter in favor of the plaintiff, John Doe, against the defendant, City of Lowell. Doe is entitled to leave without loss of pay pursuant to G. L. c. 41 § 111F. The complaint is dismissed as to defendants, John F. Cox and Edward Davis.


"|10|04
DATE

_Geraldine S. Hines_
Geraldine S. Hines
Justice of the Superior Court


*16*