12-349-04

RECEIVED
LAW DEPT.
CITY OF LOWELL

2004 NOV 16 PM 12: 07

**COMMONWEALTH OF MASSACHUSETTS**

**SUFFOLK, ss.**

**SUPERIOR COURT DEPARTMENT**
**Civil Action No. 2001-00843-F**

**JOHN DOE,**
**Plaintiff**

**vs.**

**CITY OF LOWELL & others[1],**
**Defendants**

## FINDINGS OF FACT, RULINGS OF LAW AND JUDGMENT OF THE COURT

## INTRODUCTION

The plaintiff, John Doe ("Doe"), brought this action against the defendants, City of
Lowell ("City"), John F. Cox ("Cox"), and Edward Davis ("Davis"), alleging the wrongful denial
of G. L. c. 41 § 111F disability benefits for an injury sustained in the course of his duty as a
police officer. The Complaint alleges that Doe contracted the Human Immunodeficiency Virus
(HIV) in 1989 when he pricked his finger with an infected needle while searching a suspect in
the course of his duties as a police officer. The City denied Doe's claim for benefits. Doe's
claims were tried to this court sitting without a jury on April 12, 2004. After considering the
testimony of the witnesses and reviewing the exhibits, I make the following findings of fact,
rulings of law and order for judgment.

---

[1]    John F. Cox is the City Manager of Lowell. Edward Davis is the Superintendent of the Lowell
Police Department. Judgment under G. L. c. 41, §111F, the statute under which this action is brought, does not run
against the individual officers of the city. The Complaint, therefore, shall be dismissed as to these defendants. See
Gardner v. Peabody, 23 Mass. App. Ct. 168, rev. denied 398 Mass. 1107 (1986).

1

14

## FINDINGS OF FACT

Doe is a homosexual male who has been employed as a police officer for the City of Lowell Police Department ("Department") since August 27, 1987. By all accounts, Doe was an outstanding police officer during his time with the Department. He received three citations, two commendations, numerous letters of praise and a designation as Officer of the Year in 1995. All of this changed on November 4, 1989 after the Department assigned Doe and another officer, Daniel Lamarche ("Lamarche"), to patrol the Adams Street area in Lowell.

While on patrol at approximately 4:00 p.m., Doe and Lamarche observed what they believed to be a drug transaction. When they stopped their patrol vehicle to investigate, the suspects attempted to evade them. Doe managed to apprehend one of the suspects. He then commenced a pat-down for weapons and a search for narcotics. While conducting the search, Doe stuck his bare right index finger on a hypodermic needle that was hidden in a pocket on the sleeve of the suspect's jacket. Doe noticed that the needle stick had drawn blood. The suspect was arrested for the possession of a hypodermic needle.

After the needle stick, Doe followed the Policy and Procedures Regarding Possible Exposure of Department Personnel to Infectious Disease ("Policy") adopted by the Department in January 1988. The Policy applies to:

> any care provider (e.g. EMT, fire fighter, police officer, or corrections officer) who believes he or she may have had an unprotected exposure to an infectious disease in the course of attending, assisting, or transporting a person to a hospital or clinic as part of his/her professional duties.

Though the Policy requires that all officers carry protective disposable gloves while on duty, it

---

[2] Even if Doe had worn latex gloves, it is unlikely that this precaution would have prevented the needle stick.

2

does not explicitly require officers to use gloves during the search of a subject.[2] The precautions outlined in the Policy are mandated only when police officers are "involved in an incident which may result in possible exposure to infectious disease." The Policy makes no attempt to further define when precautionary measures are required. A police officer who suffers a puncture wound in the line of duty also is obligated to notify his supervisor immediately and complete an incident report detailing the incident. The Policy further requires that the exposed officer be clinically evaluated for evidence of infection through the City of Lowell Physician's Office. No provision is made under the Policy for testing of a needle or any other object that has exposed a police officer to the risk of infection. Lastly, the Policy does not impose the burden of testing on the employee.

Immediately after the incident, Doe went to the emergency department of St. Joseph's Hospital to seek care for his possible exposure to an infectious disease. The treating physicians at St. Joseph's Hospital administered a tetanus shot and the first of three vaccinations against Hepatitis B, a blood born pathogen. The physicians at St. Joseph's Hospital did not test Doe for HIV, the virus that causes Acquired Immune Deficiency Syndrome (AIDS). Doe was instructed to soak his right index finger and to schedule a follow-up appointment with Dr. John Janas, the City Physician. On November 30, 1989, Doe reported as required for the follow-up appointment with Dr. Janas who also did not recommend HIV testing to Doe. Dr. Janas determined that Doe's physical examination was "within normal limits" and that "at this time [there is] no sequelae."

Doe also took immediate steps to notify his supervisor of the incident. He filed a report,

---

[2]      Even if Doe had worn latex gloves, it is unlikely that this precaution would have prevented the needle stick.

[3]      Defendant complains that Doe failed to complete a "standardized form at the health care facility in accordance with G. L. c. 111 and 111C" in violation of the Department's Policy. It does not appear, however, that Doe can be faulted for failing to complete the form. There is no evidence that this form, which presumably is in the

3

as required by the Department's Policy, outlining the details of the incident.[3]  At no time did the Department challenge the accuracy and completeness of the report, investigate the report or demand additional information from Doe.

The Department never tested the needle for the presence of HIV.  Nor is testing required under the Policy.  The Policy provides only that items contaminated with blood or other body fluids be secured, tagged and preserved.  At some point in 2001, however, the City's counsel placed the needle in a safe at Lowell City Hall.

In August 1991, Doe tested positive for HIV.[4]  HIV is a sexually transmitted disease that can be transmitted through contact with the bodily fluids. semen, vaginal secretions, blood, and the breast-milk of an infected individual. HIV can be transmitted via a needle stick, though the risk of transmission is quite low.[5]  At the time of his HIV diagnosis, Doe had a CD4 cell count of 270.  The CD4 cells are a surrogate marker for the functioning of the immune system. Additionally, CD4 counts are used routinely in the field of medicine to estimate stages of the disease progression for chronic conditions like HIV.  The normal CD4 count for an individual ranges from 500 to 1500.

By early 2000, Doe's health had deteriorated to the point that he was unable to perform his duties as a police officer. Doe informed the Department of his HIV status for the first time in February 2000, when he applied for leave with pay pursuant to G. L. c. 41 § 111F.  In April 2000, Doe provided the City with a statement from his physician, Dr. Howard Libman, stating that Doe was unable to perform the tasks required of a police officer due to his deteriorating health.  Dr. Libman did not opine on the cause of Doe's incapacitation.  Doe has not reported for

---

custody or control of the hospital or medical facility, was ever given to Doe.  In any event, the failure to complete the form does not bear on the issues before me.

[4]    Doe was motivated to get tested because of a relationship involving unprotected sex with another man.  He was also responding to the vigorous advocacy of HIV testing.

[5]    The undisputed evidence is that the risk of transmission is 0.1%.

4

duty since January 2000.

Doe's baseline HIV status at the time of the needle stick is unknown because the physicians who treated Doe never recommended or administered an HIV test to Doe. In addition, the needle and the suspect who carried it, were never tested in order to ascertain whether either was infected with HIV. In 1991 when Doe informed the Department that he had contracted HIV from the needle stick, testing would have been futile. The available scientific evidence suggests that it would not have been possible for the HIV virus to survive the two years that elapsed between the needle stick and Doe's HIV diagnosis.

Beginning in or about 1987, Doe began a long term monogamous relationship with another man. After three months, Doe and the man engaged in unprotected sexual activity which continued until their relationship ended in 1990. This man tested negative for HIV on May 20, 2003. Prior to this relationship, Doe engaged in oral sex with other men. Doe, however, used a condom each time he engaged in oral sex with these individuals. Doe has never been an intravenous drug user and has never had a blood transfusion.

The City denied Doe's claim for leave with pay on May 10, 2000, pursuant to the recommendation of its medical expert, Dr. Jeffrey Griffith[6], who concluded that Doe's HIV status was not the result of "an injury sustained in the performance of his duty without fault of his own." Specifically, Dr. Griffith opined that Doe likely contracted HIV seven years prior to his 1991 diagnosis, and therefore approximately five years prior to his 1989 needle stick injury. Dr. Griffith's analysis was informed by several medical publications that, in his view, support the hypothesis that HIV infected persons generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Using Doe's CD4 count of 270 at the time of diagnosis, Dr.

---

[6]       Dr. Griffith's expert qualifications include that he is Board Certified in Internal Medicine, Pediatrics, and Infectious Diseases.

5

Griffith assumed that Doe had an average CD4 count of 1000 prior to his infection and that Doe lost sixty CD4 cells per year after he became infected. According to Dr. Griffith's analysis, Doe's CD4 count of 270 corresponded with an infection seven years earlier. Dr. Griffith also supported his opinion by reference to Beth Israel Deaconess Hospital medical records suggesting that Doe was diagnosed in the early 1990s with thrush, an AIDS related condition that usually presents in patients after five to seven years of diagnosis with HIV. However, Doe's medical records do not indicate either diagnosis or treatment for thrush. Indeed, Dr. Libman, Doe's physician, certified that Doe was never diagnosed with or treated for thrush at the Beth Israel Deaconess Hospital. No record from any other physician or hospital establishes that Doe ever was diagnosed with thrush.

After his claim was denied in May 2000, Doe submitted supplemental medical information to the City and requested reconsideration of his claim for leave with pay. By letter dated December 7, 2000, the City again denied Doe's claim, maintaining its position that Doe's HIV and resulting disability were unrelated to any injury arising out of and in the course of his employment as a Lowell police officer.[7]

## CONCLUSIONS OF LAW

Doe's claim for G. L. c. 41, §111F benefits rests on his assertion that 1) during the course of his employment as a Lowell police officer, he was stuck by a needle infected with HIV; that he contracted the HIV from the needle stick; and that, as a result, he is incapacitated. The statute provides in relevant part as follows:

"Whenever a police officer or fire fighter of a city, town, or fire or water district is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own, or a police officer or fire fighter assigned to special duty by his superior officer, whether or not he is paid for such special duty by the city or town, is so

---

[7]    Dr. Elias Nabbout, the current City Physician, concluded on November 12, 2003 that Doe is medically unable to return to work. This opinion, however, sheds no light on the contested issue whether Doe's disability was caused by the needle stick.

6

incapacitated because of injuries so sustained, he shall be granted leave without loss of pay for the period of such incapacity."

Doe, as the party making the claim under G. L. c. 41, § 111F, bears the burden of proving that he satisfies all the requirements of the statute. See Adams v. Contributory Retirement Appeal Bd., 414 Mass. 360, 365 (1993)(plaintiff in analogous proceeding under G. L. c. 32, § 7(1) bears the burden of proving that he comes within all the terms of the statute).

In order to prevail on this claim, therefore, Doe must establish that: (1) he sustained an injury; (2) the injury was sustained without fault of his own; (3) the injury was sustained in the performance of his duty; and (4) he is incapacitated for duty because of that injury. Doe established that he suffered the needle stick while searching a suspect in the course of his duty as an officer. See Yates v. City of Salem, 342 Mass. 460, 461-462 (1961) (an officer injured while in uniform, performing the work of a police officer, has suffered an injury in the performance of his duty); See also Wormstead v. Town Manager of Saugus, 366 Mass. 653, 659 (1975). The needle stick that Doe sustained to his right index finger qualifies as an injury within the purview of the statute. Blair v. Board of Selectmen of Brookline, 24 Mass. App. Ct. 261, 264 (1987) (an injury for purposes of G. L. c 41, §111F need not be traumatic in origin). Additionally, the defendant does not challenge that Doe's needle stick occurred through no fault of his own. See DiGloria v. Chief of Police, 8 Mass. App. Ct. 506, 512-15 (1979)(the test for determining if the injury occurred "without fault of his own" is whether the injury occurred as a result of "serious and wilful misconduct" on the part of the police officer). Indeed, there is no evidence remotely suggestive of misconduct by Doe in causing the needle stick. The only issue, therefore, is whether Doe established that he contracted HIV from the needle stick in 1989, and that his resulting incapacitation due to the progression of HIV stems from that needle stick injury.

Doe argues, and I agree, that the evidence is sufficient to support his claim that the November 4, 1989 needle stick is the likely source of his HIV infection. Though Doe is an

7

acknowledged homosexual, the credible evidence before me establishes that Doe's sexual conduct, both before and after the needle stick, did not expose him to a substantial risk of contracting HIV. Doe engaged in oral sex with several partners in the years before the needle stick but he used a condom during those encounters. Doe's relationship with his long-time partner, a man with whom he had unprotected sex, began in 1987 and ended in 1990. This individual, however, tested negative for the HIV in 2003. Doe had no other sex partners after 1990. In these circumstances, I conclude that the needle stick on November 4, 1989 is the likely source of Doe's HIV.

Second, I credit the opinion of Dr. Jonathan Appelbaum[8], Doe's expert, that Doe's CD4 count of 270 at the time of his HIV diagnosis in 1991 was compatible with having contracted HIV in November of 1989. Dr. Appelbaum based his opinion on extensive professional experience dealing with HIV positive patients and on his review of Doe's medical records. Nothing in Doe's medical records confirmed symptoms or conditions that might be associated with HIV having been contracted seven years prior to 1989. Also, in Dr. Appelbaum's view based on his hands-on experience with hundreds of HIV patients, Doe's CD4 count was not "unusually low" for a person who had been infected for only two years. Finally, I am persuaded by Dr. Appelbaum's explanation of the risk of infection from the particular type of needle Doe encountered on November 4, 1989. Though the risk of infection from a needle is relatively low, the risk associated with the hollow-bore needle that caused the injury to Doe is higher than with ordinary needles. A hollow-bore needle is typically used by intravenous drug users, a population at high risk for HIV. Such a needle is more likely to contain blood in the cavity of the needle and, therefore, more likely to transmit HIV if the user is infected with HIV.

---

[8]    Dr. Appelbaum is board certified in internal medicine. He is the Medical Director of the Fenway Community Health Center which specializes in the treatment of HIV and AIDS patients. Dr. Appelbaum treats approximately 185 HIV/AIDS patients in his practice.

The City counters Doe's claim with Dr. Griffith's opinion that Doe was infected at least seven years prior to that date. Before reaching any conclusion on the legal significance of the expert opinion offered by the defendant, I review briefly the basic principles governing the admission of the scientific evidence.

Under Commonwealth v. Lanigan, 419 Mass. 15 (1994), a party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community, or by showing that the evidence is reliable and valid through an alternate means. Commonwealth v. Sands, 424 Mass. 184, 185-186 (1997). The trial court's acceptance of the evidentiary usefulness of a theory or method will not solely depend on general acceptance and validation over time. Lanigan, 419 Mass. at 25 (noting that peer review and publication of the theory or process are pertinent, but not an indispensable predecessor of admissibility). In order for the court to accept an expert's scientific opinion, the proponent must establish that the expert has "a reliable basis in the knowledge and experience of his discipline." Id. at 25 citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592. A trial judge assessing the credibility of an expert witness must determine whether the scientific testimony that witness proposes engenders the requisite degree of reliability and validity to meet the flexible Daubert standard. To do this, four factors may be considered: (1) whether the theory has been subjected to peer review and publication; (2) whether the theory has been tested; (3) whether the theory has a known error rate; and (4) whether the theory has general acceptance in the scientific community.    Lanigan, 419 Mass. at 25 citing Daubert, 509 U.S. at 593-94. The trial judge, in essence, assumes a "gatekeeper role" in deciding whether the reasoning or methodology of the expert can properly be applied to the facts in issue. Lanigan, 419 Mass. at 26. These considerations guide my analysis of the expert testimony on whether Doe's HIV infection resulted from the November 4, 1989 needle stick.

Since neither Doe nor the arrestee were tested at the time of the incident, the City offered expert testimony from Dr. Griffith purporting to retroactively determine the approximate date of

9

his HIV infection. Dr. Griffith's hypothesis is that individuals generally lose approximately sixty
T-cells per year in a linear fashion after contracting HIV. Additionally, individuals not infected
with HIV have, on average, a T-cell or CD4 count between 500 and 1500. Dr. Griffith, therefore,
assumed that Doe's average CD4 count prior to HIV infection was 1000, and that upon infection
Doe's CD4 count began declining at a rate of sixty T-cells per year from this base level.
Operating from this premise, Dr. Griffith then retroactively calculated that, if Doe had a CD4
count of 270 in 1991, and had lost CD4 cells at a linear rate of sixty per year from a base of
1000, then he would have contracted HIV seven years prior to 1991, and five years prior to the
1989 needle stick injury. Dr. Griffith asserts that the methodology he used to retroactively
calculate the date of Doe's HIV infection is recognized in several medical journals subject to
peer review and accepted in the general medical community. Based on this court's independent
review of the literature, however, I conclude that Dr. Griffith's opinion does not meet the
Daubert/Lanigan test.          While publication and peer review establish an indicia of reliability
and acceptance within the scientific community under Daubert, this court must examine the
reliability and validity of the articles based on their content as well.  Daubert, 509 U.S. at 592.
None of the articles relied on by Dr. Griffith establish that his methodology,  retroactively
calculating the date of HIV seroconversion[9] based on CD4 count at diagnosis, is universally
accepted or reliable in the medical community.

     A study conducted by the Cascade Collaboration, *Differences in CD4 Cell Counts at
Seroconversion and Decline Among 5739 HIV Infected Individuals with Well Estimated Dates of
Seroconversion*, J. ACQUIRED IMMUNE DEFICIENCY SYNDROME, 34:76-83 (2003)
("*Cascade Study*"), focused on assessing the effect of age, sex, exposure group, calendar year at

---

[9]       Seroconversion is the process whereby detectable antibodies become present in the blood directed
against an infectious agent. Following seroconversion, a person who is infected with HIV would test positive for
the disease based on the presence of such antibodies in his blood.

10

seroconversion, and HIV test interval on the rates of CD4 cell decline during the course of HIV infection to clinical AIDS. The *Cascade Study* highlights the difficulty with calculating a universal rate of CD4 decline in HIV infected patients, noting that the biologic reason behind the differences in "immunologic response [to HIV] by exposure category observed in this study remains unclear." *Cascade Study* at 81. The *Cascade Study* also noted that the "difference in absolute number of CD4 cells diminishes over time," and in no way reported a finding that CD4 cells decline in a linear manner, at a rate of sixty cells per year. Id.

The only studies reporting a numerical rate of CD4 cell decline within the sample do not adequately support Dr. Griffith's methodology of retroactively calculating the date of infection where the date of seroconversion is unknown. Though one such study reported that a CD4 count declines at a rate of seventy cells per year for HIV positive patients, it did so by specifically focusing on patients in the third through sixth year of disease progression, with **known** dates of seroconversion, who may have exhibited different AIDS related conditions. Phillip C. Hopewell, *Human ImmunoDeficiency Virus- Associated Lung Infection: An Overview*; SEMINARS IN RESPIRATORY INFECTION 4: 73-74 (1989) ("*Hopewell Study*"). The only conclusion reached by the Hopewell Study was that the concept of AIDS related conditions "must be broadened to include more than the typical AIDS defining diseases." Id. at 74.

The *Hopewell Study* did not use original research, but relied on the original data as reported in Ar Moss, et al., *Seropositivity for HIV and the Development of AIDS or AIDS related conditions: Three Year Follow Up of the San Francisco General Hospital Cohort*, BRITISH MEDICAL JOURNAL 296: 745-750 (1988) ("*Moss Study*"). The *Moss Study* sampled 462 homosexual men in the early 1980s with a focus on determining the likelihood that HIV positive persons will develop AIDS after documented baseline testing. Among the findings, the *Moss Study* reported that "the baseline adjusted median T4 lymphocyte count" for the sample was set at a rate of approximately eighty-five cells per year. Id. at 749. The *Moss Study*, however, did not discuss whether the eighty-five CD4 count decline linear model accounted for

11

inter-individual variation, or whether the rate of decline was uniform throughout disease progression, changed based on the stage of disease or presence of AIDS related conditions, or varied with the concomitant increase of virus burden. The *Moss Study* also reported that a multivariate analysis of progression to AIDS revealed independent predictive effects associated with significant factors outside of T-cell count such as "(i) microglobulin concentration, (ii) packed cell volume, (iii) HIV p24 antigenaemia." Id.

A study conducted in 1996, also relied on by Dr. Griffith, directly contradicts the notion that a linear model of CD4 cell decline is scientifically accurate and significant. A.C. Lepri, et al., *Is there A General Tendency for CD4 Lymphocyte Decline to Speed Up During Human Immuno Efficiency Virus Infection? Evidence From the Italian Seroconversion Study*, JOURNAL OF INFECTIOUS DISEASES 174: 775-780 (1997) ("*Lepri Study*"). The focus of the *Lepri Study* was whether CD4 cell count decline increases or decreases as lower CD4 cell counts are reached by HIV positive patients. The reported findings of the *Lepri Study* were that, while CD4 counts suggest an increasing rate of decline of on average 100 T-cells, "there is much inter-individual variability" in the pattern of decline. Id. at 775, 776. The *Lepri Study* reported that:

> "we cannot rule out the possibility that some persons maintain high CD4 cell levels for long periods and that others may experience rapid cell decline at very late stages of the disease. The significance of the random quadratic coefficient confirms that individual patterns vary." Id. at 779.

A critical finding of the *Lepri Study* is that the model for CD4 decline, that was allowed to vary between individuals, is highly significant by the generally accepted standards of the scientific community. Id. at 777. The *Lepri Study*, therefore, acknowledges the significance of inter-individual CD4 count decline in HIV, and highlights the weaknesses, and diminished scientific significance, of the purely linear model of decline that Dr. Griffith assumes.

Additionally, the very studies relied on by Dr. Griffith also detract from the reliability of

12

his methodology by pointing out the host of factors that significantly affect HIV disease progression, and the rate of CD4 count decline of infected individuals. In P.J. Veugelers, et al., *Differences in Time from HIV Seroconversion to CD4 Lymphocyte End-points and AIDS in Cohorts of Homosexual Men.* AIDS 7: 1325-1329 (1993) ("*Veugelers Study*"), scientists concluded that observed differences in CD4 decline are the result of differences in the laboratory site where the disease is measured and the techniques used. Id. at 1328. See also *Cascade Study* at 80-81(finding that sex, exposure group, and temporal changes in HIV affect rates of disease progression); *Hopewell Study* at 73-74 (presence of AIDS related conditions like Karposis Sarcoma or Tuberculosis affects disease progression); *Lepri Study* at 777 (inter-individual variability model of CD4 decline suggests that different individuals exhibit different patterns of cell decline based on the stage of their disease and their characteristics); Dr A Alaues, et al., *Similar Rate of Disease Progression Among Individuals Infected with HIV 1 Genetic Subtypes A-D,* AIDS 13: 901-907 (1999)(suggesting that the virulence of the infecting strain and environmental factors affect the rate of HIV progression).

The studies relied on by Dr. Griffith, therefore, do not support the use of a linear model of CD4 count decline as a scientifically accepted method of retroactively determining a patient's date of HIV infection. I, therefore, find that Dr. Griffith's opinion was not developed "in a scientifically sound and methodologically reliable fashion," and fails to meet the reliability and validity standards articulated in Daubert and Lanigan. See Daubert, 509 U.S. at 590; Lanigan, 419 Mass. at 15.

The defendant suggests that Doe has not met his burden because Dr. Applebaum expressed his causation opinion by stating that Doe's HIV infection is "compatible with" Doe's needle stick in 1989. According to the defendant, this terminology is insufficient to prove that Doe meets the "more probable than not" standard of proof required here. Adopting the defendant's position would impose a standard of scientific certainty on Dr. Applebaum's testimony beyond that required by Daubert. Id at 590. Furthermore, Doe has met his burden by

13

excluding all other possible sources of HIV infection via testimony regarding his sexual and medical history. See McAuliffe v. Metcalfe, 289 Mass. 67, 69 (1935) (reasoning that there is no rule of law that a causal connection must be shown by expert testimony alone); Shrewsbury Ret. Bd. v. Contributory Ret. Appeal, 5 Mass. App. Ct. 379, 381 (1977) (suggesting that, while "evidence that A is consistent with B, does not by itself warrant a finding that A caused B," it may assist the finder of fact in reaching that result). Doe has established causation by way of his medical records and his testimony concerning his sexual conduct. The defendant did not rebut this testimony with any specific evidence tending to show that Doe was exposed to HIV by some other source.

I find that Doe is incapacitated because he is unable to perform his duties as an officer due to his deteriorating health stemming from HIV-related complications. Furthermore, on November 12, 2003, Dr. Nabbout, the City physician, found that Doe was medically unable to return to work. Doe, thus, has established that he comes within the purview of G. L. c. 41 § 111F, and that he is entitled to leave with pay.

## ORDER

For the reasons states above, I enter the following order for judgment. Judgment shall enter in favor of the plaintiff, John Doe, against the defendant, City of Lowell. Doe is entitled to leave without loss of pay pursuant to G. L. c. 41 § 111F. The complaint is dismissed as to defendants, John F. Cox and Edward Davis.

DATE _____                    _____
                                            Geraldine S. Hines
                                            Justice of the Superior Court

14

# COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Room 601
Boston, MA 02108

(617) 727-3990
(617) 720-6053

March 7, 2001

Name:                    Lowell Police Department
                         Attn: Kimberley A. McCarty, Assistant City Solicitor
                         City Hall Law Department
                         375 Merrimack Street, Rm. 64
                         Lowell, MA 01852-5986

Re: Rodney Desrosiers v. C-Lowell Police Department Dkt.# 00132550

*Via certified mail*

Dear Ms. McCarty:

Enclosed, please find a copy of a complaint that was filed with the Massachusetts Commission Against Discrimination. You are required to submit a formal answer to the Complaint in the form of a position statement. This written answer should be submitted to me within twenty one (21) days of receipt of this letter and **must be affirmed** by a person authorized to act as agent of the company who has first hand knowledge of the allegations in the Complaint.

This position statement must be copied to opposing counsel as well. If you have any questions, you may call me at the Commission (617) 727-3990 x26041.

Thank you for your anticipated cooperation.

Sincerely,

*Marzella B. Hightower*
*Administrative Assistant*
*Attorney Assisted Unit*

Cc:                      File

Complainant's Attorney:  Ellen L. Poster
                         Attorney at Law
                         68 Commercial Wharf
                         Boston, MA 02110

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Boston, MA 02108
Phone: (617) 727-3990        Fax: (617) 720-6053

08-23-2000

Attn: Attn:CHIEF EXECUTIVE OFFICER
C - Lowell Police Department
50 Arcand Drive
Lowell, MA 01852

RE:Rodney Desrosiers VS. C - Lowell Police Department
MCAD Docket No.:00132550

Dear Sir/Madam:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD) has received the above referenced complaint, which alleges that you have committed an act or acts of discrimination. A copy of that complaint is enclosed. State law requires the Commission to conduct an impartial review of these allegations.

**State law requires that you submit a formal written answer to the complaint in the form of a Position Statement, attested to under oath by a principal of the Respondent other than representing counsel. This Position Statement should be submitted to your attorney investigator within twenty-one (21) days of receipt of this notification. At the same time a copy must also be served on the Complainant's attorney by mail to the address listed below.**

The Commission encourages parties to consider rapid, informal, and voluntary resolution of disputes as an alternative to the often lengthy and expensive litigation process. To discuss the possibility of settlement, please contact the opposing counsel. If both parties express interest in mediation, then contact the undersigned for further information.

Enclosed please find a brief fact sheet designed to address the most frequently asked questions about the Attorney Assisted Unit. If you have any further questions pertaining to this investigation, please contact the undersigned at (617) 727-3990 extension 26041.

Sincerely,


Marzella Hightower
Adminstrative Assistant
Attorney Assisted Unit (AAU)

cc:


FORM: aau.ltr.resp



RECEIVED

AUG 21 2000

COMMISSION AGAINST
DISCRIMINATION

COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION

1 Ashburton Place

Boston, Massachusetts 02108

Docket No. _00132550_

Complainant _Rodney Desrosiers_

Respondent _City of Lowell Police Dept._

## APPEARANCE OF COUNSEL

I appear as attorney for

☒ Complainant ☐ Respondent
in the above named complaint.

_Ellen L. Poster_
Print Attorney's name

_Ellen L. Poster_
Signature of Attorney

_68 Commercial Wharf_
_Boston, MA 02110_
Address

_617-742-6767_
Telephone No.

_8/21/00_
Date

### The Commonwealth of Massachusetts
### Commission Against Discrimination

DOCKET NUMBER:00132550

FILING DATE:08-21-2000

*16 CPO 2593*

EEOC/HUD NUMBER:

VIOLATION DATE:02/22/00

--------------------------------------------------------------------

Name of Aggrieved Person or Organization:

Rodney Desrosiers
C/O Ellen Poster, Esq.
68 Commerciall Wharf
Boston, MA 02110
Telephone Number: (617) 742-6767

--------------------------------------------------------------------

Named is the employer, labor organization, employment agency, or state/local
government agency who discriminated against me:

C - Lowell Police Department
Attn:CHIEF EXECUTIVE OFFICER
50 Arcand Drive
Lowell, MA 01852
Telephone Number:(978) 937-3200        No. of Employees:20 +

Work Location: Lowell, MA

--------------------------------------------------------------------

Cause of Discrimination based on:

Disability.
(Disability, unspecified or general).

--------------------------------------------------------------------

**The particulars are:**

I,  Rodney Desrosiers,  the Complainant  believe  that  I  was
discriminated against by C - Lowell Police Department, on the basis
of Disability. This is in violation of M. G. L. Chapter 151B S4 P
16.

SEE ATTACHED.

--------------------------------------------------------------------

I swear or affirm that I have read this complaint and that it is
true to the best of my knowledge, information and belief.

_____
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME THIS 23rd Day of August, 2000

NOTARY PUBLIC: _____

SIGNATURE    NOTARY    PUBLIC:_____    MY    COMMISSION
EXPIRES:_____



00132550

I believe I am being discriminated against by the C – Lowell Police Department on the basis of my handicap (Hiv Positive) In violation of Massachusetts General Laws Chapter 151B Section 16, and the Americans With Disabilities Act.

On or about 11/4/89, I was stuck with a needle in the line of duty.
In or around 8/91, I became informed that I was HIV positive.
After testing positive, I followed up with Beth Isreal Hospital, whom I now receive treatment from at the present time.
On or about 2/21/00, through my then attorney at the time Denise McWilliams, the department was informed of my medical condition per discussion with Chief Davis, with whom she requested that my condition be kept confidential. Chief Davis promised atty McWilliams confidentiality in the matter. In about a week, during a meeting with co – workers, I then became aware, that the reasons for my absence from work were known. Since early 2/00, I have been out of work due to physical complications caused by the HIV virus.
I feel that even if I were physically able to return to work, I could not, due to the hostile work environment I would endure due to my co - workers perception of people with HIV.

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 21ST DAY
OF AUGUST, 2000.
Jerome E. Mach
My Commission Expires
7/14/06

8/21/00

| AMENDED    CHARGE OF DISCRIMINATION | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA<br>☐ EEOC   00132550 |

## Massachusetts Commission Against Discrimination ___ and EEOC
### (State or local Agency, if any)

NAME (Indicate Mr., Ms., or Mrs.)

Rodney Desrosiers C/O Ellen Poster, Esq.

| STREET ADDRESS | CITY, STATE AND ZIP CODE | HOME TELEPHONE NO. (Include Area Code) |
|---|---|---|
| 68 Commercial Wharf | Boston, MA 02110 | (617) 742-6767 |
| | | COUNTY |
| | | Suffolk |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NO. OF EMPLOYEES/MEMBERS | TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| City of Lowell Police Dept. | 20+ | (978) 937-3200 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 50 Arcand Drive | Lowell, MA 01852 |

| NAME | |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE |
| | TELEPHONE NUMBER (Include Area Code) |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ AGE   ☐ RETALIATION   ☒ OTHER(Specify)

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year)

2/22/00

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

I, Rodney Desrosiers, the Complainant, believe that I was discriminated against by the Lowell Police Department on the basis of disability.  This is in violation of M.G.L. c. 151B Section 4 Paragraph 16.

SEE ATTACHED.

RECEIVED
NOV 27 2000
COMMISSION AGAINST DISCRIMINATION

☒ I also want this charge filed with the EEOC.
I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

X _(signature)_

Date 11/24/00   Charging Party (Signature)

NOTARY - (When necessary to meet State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT— _(signature)_

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE _Ellen Post_
(Day, month, and year)  11/24/00  Notary- Ellen L. Poster
Notary Public
My Commission
Expires -
10/5/01

EEOC FORM 5
MAR 84      PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

I believe that I am being discriminated against by the City of Lowell Police Department (hereinafter "the Department") on the basis of my handicap (HIV Positive), in violation of Massachusetts General Laws Chapter 151B Section 4(16), and the Americans With Disabilities Act.

On or about 11/4/89, I was stuck with a needle in the line of duty.
In or around 8/91, I became informed that I was HIV positive.
After testing positive, I followed up with Beth Israel Hospital, whom I now receive treatment from at the present time.
On or about 2/21/00, through my then attorney at the time Denise McWilliams, the department was informed of my medical condition per discussion with Chief Davis, with whom she requested that my condition be kept confidential. Chief Davis promised Attorney McWilliams confidentiality in the matter. In about a week, during a meeting with coworkers, I then became aware, that the reasons for my absence from work were known. Since early 2/00, I have been out of work due to physical complications caused by the HIV virus.
I feel that even if I were physically able to return to work, I could not, due to the hostile work environment I would endure due to my coworkers perception of people with HIV.
I am a qualified handicapped person capable of performing the essential function of my position as a police officer with reasonable accommodation. I am presently on sick leave from the Department. Other police officers have taken extended sick leave from the Department due to their medical conditions, and their medical conditions have been kept confidential by the Department (except with regard to medical conditions caused by injuries otherwise known to the public, such as automobile accidents involving police officers reported in the local press) whereas my medical condition was not kept confidential, even after my express request that it be kept confidential. By failing to keep my medical condition confidential, the Department did "otherwise discriminate against" me because of my handicap. The release of confidential medical information by the Department to my coworkers was a violation of my privacy. Coworkers at the Department have a negative perception of people who are HIV positive and express their views in the workplace, so that their knowledge of my condition has caused me great emotional distress.

√ 1029d
#6916

2003 NOV 24 AM 11: 42

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108

NOV 2 0 2003

Ellen L. Poster, Esquire
Attorney at Law
68 Commercial Wharf
Boston, MA 02110

RE:  Rodney Desrosiers v. City of Lowell Police Department
MCAD DOCKET NO: 00132550

Dear Parties:

On November 10, 2003 a preliminary hearing was held regarding the above reference complaint to consider the Complainant's appeal of lack of probable cause finding issued in this Complaint on September 18, 2003.

Based upon information presented at the appeal hearing and a review of the evidence adduced in investigation, I have determined that the Lack of Probable Cause finding in this case is affirmed. This means that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed.

All employment complaints where applicable, are dual filed with the U.S. Equal Employment Opportunity Commission (EEOC).  Our finding will be forwarded to its Area Office, JFK Federal Building, Boston, MA 02203. The MCAD finding will be given substantial weight by the EEOC provided that such finding are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and or The Americans with disabilities Act of 1990.

Very truly yours,

Walter J. Sullivan, Jr.
Investigating Commissioner

cc: Kimberley A McMahon, Assistant City Solicitor
    City of Lowell, Law Department
    375 Merrimack Street, 3rd Floor
    Lowell, MA 01852

No 290

6416

RECEIVED
LAW DEPT.
CITY OF LOWELL

2003 SEP 22  PM 12: 09

# The Commonwealth of Massachusetts
## Commission Against Discrimination
### One Ashburton Place, Boston, MA 02108

**Phone: (617) 994-6000**                                   **Fax: (617) 994-6024**

9/16/03    - **DISMISSAL and NOTIFICATION of RIGHTS** -

To:  Ellen L. Poster, Esq.            **Case:** Rodney Desrosiers v. C-Lowell Police
Attorney at Law                    Department
68 Commercial Wharf            **MCAD Docket Number:** 00BEM2550
Boston, MA 02110                 **EEOC Number:** 16CA02593
                                   **Investigator:** Joel Posner, Esq.

Your complaint has been dismissed for the following reasons:

[ ]     The facts alleged fail to state a claim under any of the statutes the Commission enforces.

[ ]     Respondent employs less than the required number of employees.

[ ]     Your complaint was not timely filed with the Commission, i.e. you waited too
long after the date(s) of the alleged discrimination to file.  Because it was filed outside the time
limit prescribed by law, the Commission cannot investigate your allegations.

[ ]     You failed to provide requested information, failed or refused to appear or to be available for
necessary interviews/conference, or otherwise refused to cooperate to the extent that the
Commission has been unable to resolve your complaint.  You have had more than 30 days in
which to respond to our written request.

[ ]     The Commission's efforts to locate you have been unsuccessful.  You have had at
least 30 days in which to respond to a notice sent to your last known address.

[ ]     The Respondent has made a reasonable settlement, offering full relief for the
harm you alleged.  30 days have expired since you received actual notice of this settlement offer.

**[XX]    The Commission issues the following determination.  Based upon the
Commission's investigation, the Commission is unable to conclude that the information
obtained establishes a violation of the statutes.  This does not certify that the Respondent is
in compliance with the statutes.  No finding is made as to any other issues that might be
construed as having been raised by this complaint.**

[ ]     Other (briefly state)

### - NOTICE of APPEAL -

If you wish to appeal the dismissal of your complaint and believe that the above stated reason for
dismissal is incorrect, you may appeal to this Commission within 10 days after receipt of this notice.
You or your attorney must make your appeal of the dismissal in writing to the appeals clerk of this
Commission. **Attention: Nancy To.**

All employment complaints, where applicable, were filed by the MCAD with the Equal Employment Opportunity Commission. Our finding, which will be forwarded to its area office, JFK Federal Building, Boston, MA will be given substantial weight provided that such findings are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the ADEA, and/or the ADA, as amended.

Walter J. Sullivan Jr.
Investigating Commissioner

Date

Cc:

Kimberely A. McMahon, Esq.
Assistant City Solicitor
City of Lowell
375 Merrimack Street, 3rd Fl
Lowell, MA 01852

Memorandum

To: Case File
Fr: Attorney Assisted Unit
Case: Desrosiers v. City of Lowell Police Department
MCAD Docket: 00132550
EEOC Docket: 16CA02593
Investigator: Joel Posner
Re: Lack of Probable Cause Recommendation


On November 27, 2000 the Complainant filed the instant complaint[1] with this Commission alleging he was discriminated against on the basis of his handicap (Status as HIV Positive), subjected to Disparate Treatment and a Hostile Work Environment in violation of G.L. c. 151B §4 ¶ 16 and the Americans with Disabilities Act as amended, as well as being retaliated against in violation of G.L. 151B §4 ¶ 4.

Summary of Allegations

Complainant states that he is an employee of the Lowell Police Department currently on Medical Leave. On or about November 1989 he states that he contracted HIV in the line of duty and went on medical leave on or about February 2000. He claims that Respondent was informed by his attorney of his condition February 21, 2000 and requested it be kept confidential with the exception of Respondent's personnel with a need to access his medical records. Since that time, Complainant alleges that his reasons for his absence from work have become known without explanation. Further, he is aware of several derogatory comments regarding his sexual orientation and HIV status that have been made by fellow officers and other colleagues. For this reason he states that even if he were physically able to perform the required duties, he would be subject to a hostile work environment. Additionally, Complainant argues that as a consequence of his filing the instant complaint that he has been retaliated against and had difficulty with his healthcare assignments

Respondent denies that Complainant has been subjected to harassment as alleged. They allege that the Complainant is not able to prove he was the victim of handicap discrimination as the he has not proved that he is a qualified handicapped individual, nor that he would be able to perform the requirements of the position with or without an accommodation. They argue that Complainant is unable to prove a Hostile Work Environment as he was not exposed to these comments in the workplace and additionally, once informed that co-workers were discussing Complainants condition Respondent took prompt corrective action. Respondent further argues that they have not retaliated against Complainant as a result of his filing a complaint with this Commission.

---

[1] The Complainant actually filed two complaints with this Commission, MCAD Docket Nos. 00132550 and 031301030) The first alleged Handicap Discrimination and Disparate Treatment. The second alleged retaliation for the filing of the instant complaint. As both of these complaints were based on the same underlying cause of action, they were combined.

Investigation

Complainant is unable to sustain an action for Handicap Discrimination, Disparate Treatment and Hostile Work Environment based on the evidence submitted. While his claims may be appropriate for other forums, they are inappropriate for the Commission to address at this time.

HANDICAP DISCRIMINATION

Complainant cannot state a case for Handicap Discrimination based on the facts he has alleged. In order to state a case for Handicap Discrimination, Complainant must show he was treated differently due to his handicap. While the release of his confidential information is troubling and may be the basis of a successful action in another forum, Complainant has provided insufficient information to show this behavior was motivated by discriminatory intent.

Traditionally, a successful charge of Handicap Discrimination will begin with a showing that Complainant suffers from a handicap, has a record of handicap or is perceived as handicapped. Here, Complainant has satisfied this first element. He has shown that he suffers from HIV which has been classified as a disability in Bragdon v. Abbot, 524 US 624 (1998) The Complainant must then show that he is a qualified handicapped individual, that he is able to perform the requirements of his position with or without a reasonable accommodation, that he was terminated or suffered an adverse employment action Ryan v. Town of Lunenberg, 11 MDLR 1215(1989); McLain v. Holyoke Hospital, Inc., 19 MDLR 101 (1997). While some Courts have required Complainants prove that the position they occupied remained open and Respondent sought to fill it, Dart v. Browning Ferris Industries, Inc. 427 Mass. 1,3 (1998), Massachusetts Courts have also recognized that some of the elements of a Prima Facie case must be adjusted when different fact patterns arise, Wheelock College v. MCAD 371 Mass. 130 (1976). Whatever elements Complainant uses, it is undisputed that they must show some sort of discriminatory motive. Complainant's failure to do so is fatal to his claim of handicap discrimination.

Complainant's allegations center around Respondent's failure to keep his medical information confidential as was agreed. According to the Complainant, Respondent was informed of his medical condition and within a week other members of the staff knew and were discussing it amongst themselves. Again, while this breach of confidentiality along with the other allegations raised by Complainant are troubling, he has failed to submit evidence linking them to any discriminatory animus aside from conclusory statements.

DISPARATE TREATMENT

MCAD, 400 Mass. 156 (1987). In the instant case, as a result of the Complainant's medical leave status he will be unable to prove the necessary elements of this claim.

Complainant will be unable to show that he has been subjected to unwelcome conduct. According to the Complainant's own statements and affidavits submitted on his behalf, he has yet to be directly exposed to any of the alleged discriminatory behavior with the exception of undeveloped allegations of comments that he was able to shrug off. For each of the developed allegations of derogatory statements, Complainant was informed by a third part of varied comments made by his fellow officers, not subject to them personally. This differs sharply from others who are directly exposed to their co-workers verbal or physical acts of discrimination.

In addition, the acts of discrimination alleged in this charge could not have affected his ability to perform the requirements of his job. At the time of the discriminatory events, he was out on medical leave and not performing his job in any capacity. While Complainant feels, perhaps correctly, that exposure to this conduct may adversely affect his ability to function as an employee of the Respondent it has not yet and as a result he fails to satisfy the elements of the proof.

Conclusion

For the forgoing reasons, it is recommended that the Commission issue a determination of Lack of Probable Cause.


Joel Posner
Attorney Investigator

Sunila Thomas-George
Supervisor

EEOC Form 161 (3/98)                    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# DISMISSAL AND NOTICE OF RIGHTS

To: **Rodney Desrosiers**
    **C/O Ellen Poster, Esq.}68 Comm**
    **Erciall Wharf**
    **Boston, MA 02110**

From:  **Boston Area Office**
       **John F. Kennedy Fed Bldg**
       **Government Ctr, Room 475**
       **Boston, MA 02203**

| | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16C-2000-02593 | **Anne R. Giantonio,**<br>**Intake Supervisor** | **(617) 565-3189** |

## THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans with Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge. |
| [ ] | Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge. |
| [ ] | While reasonable efforts were made to locate you, we were not able to do so. |
| [ ] | You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged. |
| [ ] | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [X] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other (briefly state) |

## - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

**Robert L. Sanders,**
**Director**

JUN 7 – 2004

(Date Mailed)

Enclosure(s)

cc: **C-LOWELL POLICE DEPARTMENT**
    **50 Arcand Drive**
    **Lowell, MA 01852**