**NOTIFY**

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.
                                                          SUPERIOR COURT DEPARTMENT
                                                          Civil Action No. 2001-00843-F

JOHN DOE,
        Plaintiff

vs.

CITY OF LOWELL & others[1],
        Defendants

## FINDINGS OF FACT, RULINGS OF LAW AND JUDGMENT OF THE COURT

### INTRODUCTION

The plaintiff, John Doe ("Doe"), brought this action against the defendants, City of Lowell ("City"), John F. Cox ("Cox"), and Edward Davis ("Davis"), alleging the wrongful denial of G. L. c. 41 § 111F disability benefits for an injury sustained in the course of his duty as a police officer. The Complaint alleges that Doe contracted the Human Immunodeficiency Virus (HIV) in 1989 when he pricked his finger with an infected needle while searching a suspect in the course of his duties as a police officer. The City denied Doe's claim for benefits. Doe's claims were tried to this court sitting without a jury on April 12, 2004. After considering the testimony of the witnesses and reviewing the exhibits, I make the following findings of fact, rulings of law and order for judgment.

---

[1] John F. Cox is the City Manager of Lowell. Edward Davis is the Superintendent of the Lowell Police Department. Judgment under G. L. c. 41, §111F, the statute under which this action is brought, does not run against the individual officers of the city. The Complaint, therefore, shall be dismissed as to these defendants. See Gardner v. Peabody, 23 Mass. App. Ct. 168, rev. denied 398 Mass. 1107 (1986).

The City denied Doe's claim for leave with pay on May 10, 2000, pursuant to the recommendation of its medical expert, Dr. Jeffrey Griffith[6], who concluded that Doe's HIV status was not the result of "an injury sustained in the performance of his duty without fault of his own." Specifically, Dr. Griffith opined that Doe likely contracted HIV seven years prior to his 1991 diagnosis, and therefore approximately five years prior to his 1989 needle stick injury. Dr. Griffith's analysis was informed by several medical publications that, in his view, support the hypothesis that HIV infected persons generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Using Doe's CD4 count of 270 at the time of diagnosis, Dr. Griffith assumed that Doe had an average CD4 count of 1000 prior to his infection and that Doe lost sixty CD4 cells per year after he became infected. According to Dr. Griffith's analysis, Doe's CD4 count of 270 corresponded with an infection seven years earlier. Dr. Griffith also supported his opinion by reference to Beth Israel Deaconess Hospital medical records suggesting that Doe was diagnosed in the early 1990s with thrush, an AIDS related condition that usually presents in patients after five to seven years of diagnosis with HIV. However, Doe's medical records do not indicate either diagnosis or treatment for thrush. Indeed, Dr. Libman, Doe's physician, certified that Doe was never diagnosed with or treated for thrush at the Beth Israel Deaconess Hospital. No record from any other physician or hospital establishes that Doe ever was diagnosed with thrush.

After his claim was denied in May 2000, Doe submitted supplemental medical information to the City and requested reconsideration of his claim for leave with pay. By letter

---

[6] Dr. Griffith's expert qualifications include that he is Board Certified in Internal Medicine, Pediatrics, and Infectious Diseases.

dated December 7, 2000, the City again denied Doe's claim, maintaining its position that Doe's HIV and resulting disability were unrelated to any injury arising out of and in the course of his employment as a Lowell police officer.[7]

## CONCLUSIONS OF LAW

Doe's claim for G. L. c. 41, §111F benefits rests on his assertion that 1) during the course of his employment as a Lowell police officer, he was stuck by a needle infected with HIV; that he contracted the HIV from the needle stick; and that, as a result, he is incapacitated. The statute provides in relevant part as follows:

> "Whenever a police officer or fire fighter of a city, town, or fire or water district is incapacitated for duty because of injury sustained in the performance of his duty without fault of his own, or a police officer or fire fighter assigned to special duty by his superior officer, whether or not he is paid for such special duty by the city or town, is so incapacitated because of injuries so sustained, he shall be granted leave without loss of pay for the period of such incapacity."

Doe, as the party making the claim under G. L. c. 41, § 111F, bears the burden of proving that he satisfies all the requirements of the statute. See Adams v. Contributory Retirement Appeal Bd., 414 Mass. 360, 365 (1993)(plaintiff in analogous proceeding under G. L. c. 32, § 7(1) bears the burden of proving that he comes within all the terms of the statute).

In order to prevail on this claim, therefore, Doe must establish that: (1) he sustained an injury; (2) the injury was sustained without fault of his own; (3) the injury was sustained in the performance of his duty; and (4) he is incapacitated for duty because of that injury. Doe established that he suffered the needle stick while searching a suspect in the course of his duty as

---

[7] Dr. Elias Nabbout, the current City Physician, concluded on November 12, 2003 that Doe is medically unable to return to work. This opinion, however, sheds no light on the contested issue whether Doe's disability was caused by the needle stick.

7

an officer. See <u>Yates</u> v. <u>City of Salem</u>, 342 Mass. 460, 461-462 (1961) (an officer injured while in uniform, performing the work of a police officer, has suffered an injury in the performance of his duty); See also <u>Wormstead</u> v. <u>Town Manager of Saugus</u>, 366 Mass. 653, 659 (1975). The needle stick that Doe sustained to his right index finger qualifies as an injury within the purview of the statute. <u>Blair v. Board of Selectmen of Brookline</u>, 24 Mass. App. Ct. 261, 264 (1987) (an injury for purposes of G. L. c 41, §111F need not be traumatic in origin). Additionally, the defendant does not challenge that Doe's needle stick occurred through no fault of his own. See <u>DiGloria</u> v. <u>Chief of Police</u>, 8 Mass. App. Ct. 506, 512-15 (1979)(the test for determining if the injury occurred "without fault of his own" is whether the injury occurred as a result of "serious and wilful misconduct" on the part of the police officer). Indeed, there is no evidence remotely suggestive of misconduct by Doe in causing the needle stick. The only issue, therefore, is whether Doe established that he contracted HIV from the needle stick in 1989, and that his resulting incapacitation due to the progression of HIV stems from that needle stick injury.

Doe argues, and I agree, that the evidence is sufficient to support his claim that the November 4, 1989 needle stick is the likely source of his HIV infection. Though Doe is an acknowledged homosexual, the credible evidence before me establishes that Doe's sexual conduct, both before and after the needle stick, did not expose him to a substantial risk of contracting HIV. Doe engaged in oral sex with several partners in the years before the needle stick but he used a condom during those encounters. Doe's relationship with his long-time partner, a man with whom he had unprotected sex, began in 1987 and ended in 1990. This individual, however, tested negative for the HIV in 2003. Doe had no other sex partners after

1990. In these circumstances, I conclude that the needle stick on November 4, 1989 is the likely source of Doe's HIV.

Second, I credit the opinion of Dr. Jonathan Appelbaum[8], Doe's expert, that Doe's CD4 count of 270 at the time of his HIV diagnosis in 1991 was compatible with having contracted HIV in November of 1989. Dr. Appelbaum based his opinion on extensive professional experience dealing with HIV positive patients and on his review of Doe's medical records. Nothing in Doe's medical records confirmed symptoms or conditions that might be associated with HIV having been contracted seven years prior to 1989. Also, in Dr. Appelbaum's view based on his hands-on experience with hundreds of HIV patients, Doe's CD4 count was not "unusually low" for a person who had been infected for only two years. Finally, I am persuaded by Dr. Appelbaum's explanation of the risk of infection from the particular type of needle Doe encountered on November 4, 1989. Though the risk of infection from a needle is relatively low, the risk associated with the hollow-bore needle that caused the injury to Doe is higher than with ordinary needles. A hollow-bore needle is typically used by intravenous drug users, a population at high risk for HIV. Such a needle is more likely to contain blood in the cavity of the needle and, therefore, more likely to transmit HIV if the user is infected with HIV.

The City counters Doe's claim with Dr. Griffith's opinion that Doe was infected at least seven years prior to that date. Before reaching any conclusion on the legal significance of the expert opinion offered by the defendant, I review briefly the basic principles governing the admission of the scientific evidence.

---

[8] Dr. Appelbaum is board certified in internal medicine. He is the Medical Director of the Fenway Community Health Center which specializes in the treatment of HIV and AIDS patients. Dr. Appelbaum treats approximately 185 HIV/AIDS patients in his practice.

9

Under Commonwealth v. Lanigan, 419 Mass. 15 (1994), a party seeking to introduce scientific evidence may lay an adequate foundation either by establishing general acceptance in the scientific community, or by showing that the evidence is reliable and valid through an alternate means. Commonwealth v. Sands, 424 Mass. 184, 185-186 (1997). The trial court's acceptance of the evidentiary usefulness of a theory or method will not solely depend on general acceptance and validation over time. Lanigan, 419 Mass. at 25 (noting that peer review and publication of the theory or process are pertinent, but not an indispensable predecessor of admissibility). In order for the court to accept an expert's scientific opinion, the proponent must establish that the expert has "a reliable basis in the knowledge and experience of his discipline." Id. at 25 citing Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592. A trial judge assessing the credibility of an expert witness must determine whether the scientific testimony that witness proposes engenders the requisite degree of reliability and validity to meet the flexible Daubert standard. To do this, four factors may be considered: (1) whether the theory has been subjected to peer review and publication; (2) whether the theory has been tested; (3) whether the theory has a known error rate; and (4) whether the theory has general acceptance in the scientific community. Lanigan, 419 Mass. at 25 citing Daubert, 509 U.S. at 593-94. The trial judge, in essence, assumes a "gatekeeper role" in deciding whether the reasoning or methodology of the expert can properly be applied to the facts in issue. Lanigan, 419 Mass. at 26. These considerations guide my analysis of the expert testimony on whether Doe's HIV infection resulted from the November 4, 1989 needle stick.

Since neither Doe nor the arrestee were tested at the time of the incident, the City offered expert testimony from Dr. Griffith purporting to retroactively determine the approximate date of

his HIV infection. Dr. Griffith's hypothesis is that individuals generally lose approximately sixty T-cells per year in a linear fashion after contracting HIV. Additionally, individuals not infected with HIV have, on average, a T-cell or CD4 count between 500 and 1500. Dr. Griffith, therefore, assumed that Doe's average CD4 count prior to HIV infection was 1000, and that upon infection Doe's CD4 count began declining at a rate of sixty T-cells per year from this base level. Operating from this premise, Dr. Griffith then retroactively calculated that, if Doe had a CD4 count of 270 in 1991, and had lost CD4 cells at a linear rate of sixty per year from a base of 1000, then he would have contracted HIV seven years prior to 1991, and five years prior to the 1989 needle stick injury. Dr. Griffith asserts that the methodology he used to retroactively calculate the date of Doe's HIV infection is recognized in several medical journals subject to peer review and accepted in the general medical community. Based on this court's independent review of the literature, however, I conclude that Dr. Griffith's opinion does not meet the Daubert/Lanigan test.

While publication and peer review establish an indicia of reliability and acceptance within the scientific community under Daubert, this court must examine the reliability and validity of the articles based on their content as well. Daubert, 509 U.S. at 592. None of the articles relied on by Dr. Griffith establish that his methodology, retroactively calculating the date of HIV seroconversion[9] based on CD4 count at diagnosis, is universally accepted or reliable in the medical community.

A study conducted by the Cascade Collaboration, *Differences in CD4 Cell Counts at Seroconversion and Decline Among 5739 HIV Infected Individuals with Well Estimated Dates of*

---

[9] Seroconversion is the process whereby detectable antibodies become present in the blood directed against an infectious agent. Following seroconversion, a person who is infected with HIV would test positive for the disease based on the presence of such antibodies in his blood.

*11*

*Seroconversion*, J. ACQUIRED IMMUNE DEFICIENCY SYNDROME, 34:76-83 (2003) ("*Cascade Study*"), focused on assessing the effect of age, sex, exposure group, calendar year at seroconversion, and HIV test interval on the rates of CD4 cell decline during the course of HIV infection to clinical AIDS. The *Cascade Study* highlights the difficulty with calculating a universal rate of CD4 decline in HIV infected patients, noting that the biologic reason behind the differences in "immunologic response [to HIV] by exposure category observed in this study remains unclear." *Cascade Study* at 81. The *Cascade Study* also noted that the "difference in absolute number of CD4 cells diminishes over time," and in no way reported a finding that CD4 cells decline in a linear manner, at a rate of sixty cells per year. Id.

The only studies reporting a numerical rate of CD4 cell decline within the sample do not adequately support Dr. Griffith's methodology of retroactively calculating the date of infection where the date of seroconversion is unknown. Though one such study reported that a CD4 count declines at a rate of seventy cells per year for HIV positive patients, it did so by specifically focusing on patients in the third through sixth year of disease progression, with **known** dates of seroconversion, who may have exhibited different AIDS related conditions. Phillip C. Hopewell, *Human ImmunoDeficiency Virus- Associated Lung Infection: An Overview*; SEMINARS IN RESPIRATORY INFECTION 4: 73-74 (1989) ("*Hopewell Study*"). The only conclusion reached by the Hopewell Study was that the concept of AIDS related conditions "must be broadened to include more than the typical AIDS defining diseases." Id. at 74.

The *Hopewell Study* did not use original research, but relied on the original data as reported in Ar Moss, et al., *Seropositivity for HIV and the Development of AIDS or AIDS related conditions: Three Year Follow Up of the San Francisco General Hospital Cohort*, BRITISH

MEDICAL JOURNAL 296: 745-750 (1988) ("*Moss Study*"). The *Moss Study* sampled 462 homosexual men in the early 1980s with a focus on determining the likelihood that HIV positive persons will develop AIDS after documented baseline testing. Among the findings, the *Moss Study* reported that "the baseline adjusted median T4 lymphocyte count" for the sample was set at a rate of approximately eighty-five cells per year. Id. at 749. The *Moss Study*, however, did not discuss whether the eighty-five CD4 count decline linear model accounted for inter-individual variation, or whether the rate of decline was uniform throughout disease progression, changed based on the stage of disease or presence of AIDS related conditions, or varied with the concomitant increase of virus burden. The *Moss Study* also reported that a multivariate analysis of progression to AIDS revealed independent predictive effects associated with significant factors outside of T-cell count such as "(i) microglobulin concentration, (ii) packed cell volume, (iii) HIV p24 antigenaemia." Id.

A study conducted in 1996, also relied on by Dr. Griffith, directly contradicts the notion that a linear model of CD4 cell decline is scientifically accurate and significant. A.C. Lepri, et al., *Is there A General Tendency for CD4 Lymphocyte Decline to Speed Up During Human Immuno Efficiency Virus Infection? Evidence From the Italian Seroconversion Study*, JOURNAL OF INFECTIOUS DISEASES 174: 775-780 (1997) ("*Lepri Study*"). The focus of the *Lepri Study* was whether CD4 cell count decline increases or decreases as lower CD4 cell counts are reached by HIV positive patients. The reported findings of the *Lepri Study* were that, while CD4 counts suggest an increasing rate of decline of on average 100 T-cells, "there is much inter-individual variability" in the pattern of decline. Id. at 775, 776. The *Lepri Study* reported that:

*13*

> "we cannot rule out the possibility that some persons maintain high CD4 cell levels for long periods and that others may experience rapid cell decline at very late stages of the disease. The significance of the random quadratic coefficient confirms that individual patterns vary." Id. at 779.

A critical finding of the *Lepri Study* is that the model for CD4 decline, that was allowed to vary between individuals, is highly significant by the generally accepted standards of the scientific community. Id. at 777. The *Lepri Study*, therefore, acknowledges the significance of inter-individual CD4 count decline in HIV, and highlights the weaknesses, and diminished scientific significance, of the purely linear model of decline that Dr. Griffith assumes.

Additionally, the very studies relied on by Dr. Griffith also detract from the reliability of his methodology by pointing out the host of factors that significantly affect HIV disease progression, and the rate of CD4 count decline of infected individuals. In P.J. Veugelers, et al., *Differences in Time from HIV Seroconversion to CD4 Lymphocyte End-points and AIDS in Cohorts of Homosexual Men.* AIDS 7: 1325-1329 (1993) ("*Veugelers Study*"), scientists concluded that observed differences in CD4 decline are the result of differences in the laboratory site where the disease is measured and the techniques used. Id. at 1328. See also *Cascade Study* at 80-81(finding that sex, exposure group, and temporal changes in HIV affect rates of disease progression); *Hopewell Study* at 73-74 (presence of AIDS related conditions like Karposis Sarcoma or Tuberculosis affects disease progression); *Lepri Study* at 777 (inter-individual variability model of CD4 decline suggests that different individuals exhibit different patterns of cell decline based on the stage of their disease and their characteristics); Dr A Alaues, et al., *Similar Rate of Disease Progression Among Individuals Infected with HIV 1 Genetic Subtypes A-*

*D*, AIDS 13: 901-907 (1999)(suggesting that the virulence of the infecting strain and environmental factors affect the rate of HIV progression).

The studies relied on by Dr. Griffith, therefore, do not support the use of a linear model of CD4 count decline as a scientifically accepted method of retroactively determining a patient's date of HIV infection. I, therefore, find that Dr. Griffith's opinion was not developed "in a scientifically sound and methodologically reliable fashion," and fails to meet the reliability and validity standards articulated in Daubert and Lanigan. See Daubert, 509 U.S. at 590; Lanigan, 419 Mass. at 15.

The defendant suggests that Doe has not met his burden because Dr. Applebaum expressed his causation opinion by stating that Doe's HIV infection is "compatible with" Doe's needle stick in 1989. According to the defendant, this terminology is insufficient to prove that Doe meets the "more probable than not" standard of proof required here. Adopting the defendant's position would impose a standard of scientific certainty on Dr. Applebaum's testimony beyond that required by Daubert. Id at 590. Furthermore, Doe has met his burden by excluding all other possible sources of HIV infection via testimony regarding his sexual and medical history. See McAuliffe v. Metcalfe, 289 Mass. 67, 69 (1935) (reasoning that there is no rule of law that a causal connection must be shown by expert testimony alone); Shrewsbury Ret. Bd. v. Contributory Ret. Appeal, 5 Mass. App. Ct. 379, 381 (1977) (suggesting that, while "evidence that A is consistent with B, does not by itself warrant a finding that A caused B," it may assist the finder of fact in reaching that result). Doe has established causation by way of his medical records and his testimony concerning his sexual conduct. The defendant did not rebut

this testimony with any specific evidence tending to show that Doe was exposed to HIV by some other source.

I find that Doe is incapacitated because he is unable to perform his duties as an officer due to his deteriorating health stemming from HIV-related complications. Furthermore, on November 12, 2003, Dr. Nabbout, the City physician, found that Doe was medically unable to return to work. Doe, thus, has established that he comes within the purview of G. L. c. 41 § 111F, and that he is entitled to leave with pay.

### ORDER

For the reasons states above, I enter the following order for judgment. Judgment shall enter in favor of the plaintiff, John Doe, against the defendant, City of Lowell. Doe is entitled to leave without loss of pay pursuant to G. L. c. 41 § 111F. The complaint is dismissed as to defendants, John F. Cox and Edward Davis.

11/10/04
DATE

Geraldine S. Hines
Justice of the Superior Court